## In re AIRCRASH DISASTER NEAR ROSELAWN, INDIANA ON OCTOBER 31, 1994.

### No. 95 C 4593.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 17, 1995.

Robert L. Alpert, Chapel Hill, NC, Jerold S. Solovy, Anton R. Valukas, Sidney J. Scheukier, Jenner & Block, Chicago, Illinois, Charles W. Douglas, Sara J. Gourley, Sheila A. Sundvall, Sidley & Austin, Chicago, Illinois, for: American Eagle, Simmons Airlines, Inc., AMR Eagle, Inc. AMR Leasing Corporation, and Robert H. Mittelman.

Michael P. Connelly, Thomas F. Tobin, Connelly & Schroeder, Chicago, Illinois, Stephen C. Johnson, Hugh Richard Koss, Lillick & Charles, San Francisco, California, for: Avions de Transport Regional; ATR Support, Inc., and ATR Marketing, Inc.

Richard Palmer, Wildman Harrold Allen & Dixon, Chicago, Illinois, for Honeywell, Inc.

Robert E. Bennett, Robert E. Bennett & Associates, Chicago, Illinois, for: Plaintiffs, Sithole and Dhlamini (Masilo).

James T. Crouse, Speiser, Krause, Madole & Mendelsohn, San Antonio, Texas, for: Plaintiffs, Begeny, Bonneau, Bramley, Elam (Readings), Griffo, LaRoche, Robitaille and Wright.

Kevin P. Durkin & Robert A. Clifford, Clifford Law Offices, Chicago, Illinois, for: Plaintiffs MacKenzie (Tweedie), DeMarco, Guba, Modaff, Snyder and Thompson.

Michael K. Demetrio & Thomas A. Demetrio, Corboy & Demetrio, P.C., Chicago, Illinois, for: Plaintiffs Bailenson, Spencer, MacDonald, Melamed (Johnson), Parmar, Sjoberg, Cunningham, and Dwyer.

James P. Kreindler, Kreindler & Kreindler, New York City, for: Plaintiffs, Droy and MacMillin, Stackhouse, Sayles Grimberg decedents (Fla.).

Kevin M. Forde, Kevin M. Forde, Ltd., Chicago, Illinois, for: Plaintiff, Fulle.

Martin E. Klein, Law Offices of Martin E. Klein, Chicago, Illinois, for: Plaintiff, Harast (Patrick Henry).

John R. Leach, O'Quinn, Kerensky, McAninch & Laminack, Houston, Texas, for: Plaintiff, Holberg.

William F. Maready & T.C. Comerford, Robinson, Maready, Lawing & Comerford, LLP., Winston–Salem, North Carolina, for: Plaintiffs Anglemeyer and Shellberg.

Clifford M. Panek, Parrillo, Weiss & O'Halloran, Chicago, Illinois, for: Plaintiff, Calderon.

Michael F. Pezzulli, Pezzulli & Associates, Dallas, Texas, for: Plaintiffs, Ramm and Leech.

Donald L. Salem, Law Offices of D.L. Salem, San Diego, California, for: Plaintiff Ganong.

David Ian Katzman, Wilson & Katzman, Schaden, Wilson & Katzman, Broomfield, Colorado, for: Plaintiffs, Kim (Ko), Ramm and Leach.

Michael L. Slack, Slack & Davis, L.L.P., Austin, Texas, for: Plaintiff, Buck (Tribble).

Herbert F. Stride, Stride, Craddock & Stride, Chicago, Illinois, William J. Harte, William J. Harte, Ltd., Chicago, Illinois, for: Plaintiff, Ernst.

Gerard R. Lear, Speiser, Krause, Madole & Lear, Rosslyn, Virginia.

Terry O'Reilly, Law Offices of O'Reilly & Collins, Menlo Park, California.

Donald Nolan & Bill Jovan, Chicago, IL, for Severin, Moore, Cunningham, W.

Thomas P. Meehan, Sherman, Meehan & Curtin, P.C., Washington, DC, for Robert Holberg.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

On October 31, 1994, while in a holding pattern for its approach to O'Hare International Airport, American Eagle Flight 4184 from Indianapolis, Indiana to Chicago, Illinois crashed near Roselawn, Indiana. Tragically, all 64 passengers and the 4 crew members aboard the flight were killed. Today, this Court finds that it has jurisdiction to preside over the numerous actions arising out of the crash of Flight 4184 that are presently pending on this Court's docket.[1] Of these 32 actions, 21 were originally filed in the Circuit Court of Cook County, Illinois

(we shall refer collectively to these actions as the state court actions). Thereafter, Avions de Transport, Regional, G.I.E. ("ATR"), which is named in all the cases either as a defendant or a third-party defendant, removed the state court actions to federal court pursuant to 28 U.S.C. § 1441(d).[2] The plaintiffs in the state court actions now move to remand the cases back to the Circuit Court of Cook County. For the reasons that follow, plaintiffs' motion to remand is denied.

## BACKGROUND

The plaintiffs in these related actions are representatives of the estates of the crash victims. The named defendants are the airline and related entities (the "AMR defendants") as well as—in most cases—ATR and entities related to it.[3] In a very small minor-

---

1. Initially, this Court had 23 related cases arising from the crash on its docket. Twenty-one of these actions (Civil Case Nos. 94–7651, 95–252, 95–613, 95–629, 95–630, 95–631, 95–632, 95–633, 95–634, 95–636, 95–637, 95–944, 95–945, 95–946, 95–2132, 95–2133, 95–2174, 95–2249, 95–2250, 95–2251, and 95–2407) were originally filed in the Circuit Court of Cook County, Illinois and then removed to Federal court; the other two (Civil Case Nos. 95–1023 and 95–1058) were filed directly in federal court under the court's diversity jurisdiction. In addition to these 23 cases, there are an additional 19 cases that have been transferred or conditionally transferred to this Court's docket by the Judicial Panel on Multidistrict Litigation. By order of the Panel dated August 7, 1995, five additional actions arising out of the crash (Civil Case Nos. 95–4957, 95–4959, 95–4998, and 95–5130, and a yet to be numbered case with plaintiff's name *McMillin*), pending in districts outside of the Northern District of Illinois, were transferred to this Court's docket for the purpose of coordinating and consolidating pretrial proceedings with the 23 actions already before this Court. A subsequent conditional transfer order (CTO–1) issued by the Panel transferred an additional twelve cases pending in districts outside of the Northern District of Illinois to this Court's docket (these cases have not yet been assigned a Civil Case Number by this Court—by plaintiff's name these cases are: *Anglemyer* (Texas action), *Shellberg* (Texas action), *Holberg, Buck, Griffo, Bonneau, Begeny, Bramley, Wright, Elam, Xavier,* and *Robitaille*); however, pursuant to MDL Rules of Procedure, Rule 12, the plaintiffs in *Griffo, Bonneau, Begeny, Bramley, Wright, Elam, Xavier,* and *Robitaille* have opposed the transfer order and briefing on the oppositions is presently ongoing. Also, a second conditional transfer order (CTO–2) conditionally transferred two other cases to this Court's docket (*Leech* and *Ramm*); however, the automatic stay

of transfer under MDL Rule 12 has yet to expire for CTO–2. Thus, this Court does not yet have jurisdiction over the 8 opposed and 2 stayed-transfer cases. For ease of exposition, this opinion explicitly refers only to the state court cases filed in Illinois; however, the findings and conclusions contained herein are applicable to all cases now before this Court. Further, although the Court does not yet have jurisdiction over certain cases that have been conditionally transferred to this Court and while there may be new cases arising from the crash not yet filed that may be assigned to this Court in the future, the findings and conclusions contained herein will plainly affect those cases under well established principles of law.

2. 28 U.S.C. § 1441(d) provides in pertinent part:

Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury.

3. The airline related entities variously named as defendants in the state court actions include: AMR Corporation; AMR Services Leasing Corp.; AMR Leasing Corp.; American Airlines, Inc.; Simmons Airlines, Inc.; American Eagle; American Eagle Airlines, Inc.; American Eagle, Inc.; and Honeywell, Inc. The entities related to ATR named as a defendant is ATR Marketing Inc; ATR Support, Inc.; Aerospatiale Societe Nationale Industrielle; Aerospatiale, Inc.; and Alenia, a division of Finmeccanica. For ease of exposition, unless the context requires otherwise, this opinion shall refer only to ATR. Also named as a

ity of cases, only the airline and related entities are named as defendants, with ATR brought in to the action as a third party defendant. ATR allegedly manufactured the ATR72–210 aircraft involved in the crash.

ATR removed these actions from state court contending that it is a "foreign state" as that term is defined by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* ("the FSIA" or "the Act"). ATR's removal petitions state in pertinent part:

> This Court would have, and does have, original subject matter jurisdiction over this action under the provisions of 28 U.S.C. sections 1330 and 1331 in that ATR, at all relevant times, was, and is, a "foreign state" as defined in 28 U.S.C. section 1603 (Foreign Sovereign Immunities Act). ATR was, and is, a separate legal person, the majority of whose shares or other ownership interest were, and are, owned by the governments of the counties of France and Italy, it was not, and is not, a citizen of any of these United States, nor was it created under the laws of any third country.

ATR's Petition for Removal in *Severin v. American Eagle,* No. 95 C 252 ¶ 3; *see also* ATR's Petition for Removal in *Spencer v. AMR Corp.,* No. 95 C 629 ¶ 2. (These particular petitions are cited as representative exemplars of ATR's removal petitions filed in all of the state court actions.)

As evidence of its corporate structure and ownership, ATR has submitted the declaration of its Corporate Secretary, Francesco Paolo Giobbe. Giobbe states that ATR is an entity formed under French law, is not constituted under the laws of any other country, and is not incorporated in any state of the United States. Giobbe Decl. ¶¶ 2, 3. Giobbe further states that at least 65% of ATR's shares are owned by the governments of France and Italy. *Id.* ¶ 3. Specifically, Giobbe attests that:

> Fifty percent (50%) of the shares of ATR are owned by the French government national aerospace concern, Société Nationale Industrielle Aerospatiale ("SNIA"). SNIA, in turn, is majority (91.42%) owned by the French government. Of the French government's 91.42% ownership interest, 62.16% is owned directly. Another 20% is owned by SOGEPA (a 100% owned holding entity of the French Government). Another 17.81% is owned through Crédit Lyonnais. Crédit Lyonnais is itself 52% owned by the French Government.

> The other fifty percent (50%) of the shares of ATR are owned by Alenia. Alenia is a division of Finmeccanica S.p.A. Finmeccanica is the Italian government national aerospace concern, and is majority, minimum sixty-two (62%), owned by I.R.I.[4] (a 100% owned holding entity of the Italian government).

*Id.* ¶¶ 4, 5.

ATR has also submitted the declarations of Roberto Camiz, Alenia's Legal Counsel, and Philippe Simon, Deputy General Counsel for SNIA. Camiz states that Alenia is formed under Italian law, is not constituted under the laws of any other country, and is not incorporated in any state of the United States. Camiz Decl. ¶ 2. Camiz' declaration repeats the ownership information concerning Alenia contained in Giobbe's declaration and adds that Finmeccanica is "an Italian government national industrial concern acting in the aerospace field through Alenia," is formed under Italian law, is not constituted under the laws of any other country and is not incorporated in any state of the United States. *Id.* ¶ 3. Similarly, Simon's declaration states that SNIA, SOGEPA, and Crédit Lyonnais are "separate juridical entit[ies] formed under French law." Simon Decl. ¶¶ 3, 4. Simon's declaration repeats the ownership information concerning SNIA contained in Giobbe's declaration and confirms that SNIA "is the French government national aerospace concern." *Id.* ¶ 2.

Plaintiffs contest ATR's invocation of the FSIA, arguing principally that ATR's ownership structure does not entitle it to "foreign state" status under the Act. Specifically.

---

defendant in a but two of the state court actions is Robert Mittelman, Special Administrator of the Estate of Orlando Aguiar, the pilot of Flight 4184.

4. [This Court's footnote] I.R.I. is an abbreviation for Instituto Per La Ricostruzione Industriale.

plaintiffs contend that ATR's connection to its foreign state ownership interests is achieved through both "pooling" and "tiering" of such interests and that the FSIA does not recognize such mechanisms for purposes of determining whether an entity may be considered a foreign state under the Act. Plaintiffs also raise several Seventh Amendment objections to ATR's invocation of the Act.

## ANALYSIS

Plaintiffs' motion to remand requires this Court to wrestle with the vague and circuitous language of the FSIA. Federal courts that have had the opportunity to interpret the FSIA have remarked on its user-unfriendly nature with some frequency. *See e.g., Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De Navigation (C.N.A.N.),* 730 F.2d 195, 205 (5th Cir.1984) ("The FSIA presents a peculiarly twisted exercise in statutory construction."); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 302 (2d Cir.1981) (referring to the FSIA as a "vaguely worded statute"), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982); *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1106 (S.D.N.Y.1982) (referring to the FSIA as "remarkably obtuse"). Indeed, in *Udaras,* the court described the FSIA as "a six-year-old labyrinth that, owing to the numerous interpretive questions engendered by its bizarre structure and its many deliberately vague provisions, has during its brief lifetime been a financial boon for the private bar but a constant bane of the federal judiciary." 549 F.Supp. at 1105. Although the foregoing remarks have been elicited by provisions of the FSIA other than those we confront in the instant case, we find them no less appropriate with respect to § 1603, to which we shall turn momentarily.[5] First, a little background will help to put things in context.

The FSIA provides that, subject to certain exceptions enumerated in the Act, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States." 28 U.S.C. § 1604. "The Foreign Sovereign Immunities Act 'provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.'" *Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 1476, 123 L.Ed.2d 47 (1993) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.* 488 U.S. 428, 433, 109 S.Ct. 683, 687–88, 102 L.Ed.2d 818 (1989)). One of the most significant exceptions to immunity, and the one, no doubt that will ultimately come into play in this action is the "commercial activity" exception:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

The threshold inquiry in applying the Act, of course, must be whether a "foreign state", as defined by the Act, is a party to the action. That is the issue in dispute in this case. ATR contends it is a "foreign state"; the plaintiffs contend it is not. The Act defines a "foreign state" as follows:

> (a) A "foreign state", ... includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

> (b) An "agency or instrumentality of a foreign state" means any entity—

---

5. Even one of the drafters of the FSIA acknowledges that "the statute is complex and difficult to apply" and that "[i]n places the drafting is not the best." Mark B. Feldman, *The United States Foreign Sovereign Immunities Act of 1976 in Perspective: A Founder's View,* 35 Int'l & Comp. L.Q. 302, 318 (1986). All of these comments are a sad reflection on the Act, particularly in view of

the fact that the House Judiciary Committee Report described the amended bill that was to become the FSIA as "the product of many years of work by the Departments of State and Justice, in consultation with members of the bar and the academic community." H.R.Rep No. 1487, 94th Cong., 2d Sess. 9 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6608.

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603. The House Judiciary Report's section-by-section analysis of the amended bill that was to become the FSIA provides:

### Section 1603. Definitions

Section 1603 defines five terms that are used in the bill:

(a) *Foreign state.*—Subsection (a) defines the term foreign state as used in all provisions of chapter 97 [the "Jurisdictional Immunities of Foreign States" chapter of the United States Code], except section 1608. In section 1608, the term "foreign state" refers only to the sovereign state itself.

As the definition indicates, the term "foreign state" as used in every other section of chapter 97 includes not only the foreign state but also political subdivisions, agencies and instrumentalities of the foreign state.

H.R.REP. No. 1487, 94th Cong., 2d Sess. 15 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6613. With this statutory background in place, we may now consider the plaintiffs' contentions.

Before considering the principal matters at issue, we pause to dispose of a miscellany of other arguments raised by the plaintiffs.

### Sufficiency of ATR's Factual Showing as to Ownership

■ As a threshold issue, several of the plaintiffs contend that ATR's factual showing regarding its ownership structure is insufficient to support a claim of foreign-state ownership. However, the Court finds that Giobbe's declaration (in conjunction with the supporting attachments) which explicitly states that "[f]ifty percent (50%) of the shares of ATR are owned by" SNIA and "[t]he other fifty percent (50%) of the shares of ATR are owned by Alenia" is sufficient. The abstract from the Registry of Commerce and Corporations of Toulouse France accompanying Giobbe's declaration evidences that ATR is comprised of two members, SNIA and Alenia (a division of Finmeccanica S.p.A.), and that these two entities appoint representatives to the management and administration of ATR. The "Statutes" (by-laws) of ATR, also submitted in conjunction with the Giobbe declaration, add further corroboration. Additionally, we find the declarations of Messrs. Simon and Camiz, in conjunction with the supporting materials, sufficiently evidence the ownership interests of the French and Italian governments in SNIA and Alenia, respectively. Thus, what remains to be decided is whether the structure of ownership interests in ATR can support ATR's claim to foreign state status. We discuss this issue at length below.[6]

### The Purportedly "Collusive" Joinder of ATR to Create Federal Jurisdiction

■ A number of the plaintiffs argue that the AMR defendants' filing of the third-party complaints against ATR constituted a fraudulent and collusive act by and between the AMR defendants and ATR to create federal jurisdiction. Although the Court is sympa-

---

**6.** Plaintiff in the *Ganong* case makes the interesting argument that ATR, which is formed as a Groupement D'Interet Economique (Economic Interest Group or "G.I.E.") under French law and which has no capital, is not capable of being "owned", rather it merely has members. Intriguing as this notion is, we conclude that a G.I.E. may be considered an agency or instrumentality of a foreign state under the FSIA. An entity may be considered an agency or instrumentality of a foreign state under the FSIA if a majority of its shares or other ownership interests are owned by a foreign state. We find that membership in a G.I.E. is equivalent for FSIA purposes to an "ownership interest." In reaching this conclusion, we note that under Article 4 of Ordinance No. 67–821 (the Ordinance creating the G.I.E. organization), "The members of the Group are liable for the Group's indebtedness, against their own estate. The members are jointly and solidarily responsible...." That ATR's liability, if any, may run directly to its foreign state owners plainly implicates the concerns of the FSIA.

thetic to the plaintiffs' contentions that what is going on here is a transparent attempt to have these suits litigated in federal rather than state court, we find nothing improper in these efforts. Specifically, we find that there has been no manipulation of jurisdictional facts to create jurisdiction. *See Nolan v. Boeing Co.,* 919 F.2d 1058 (5th Cir.1990), *cert. denied,* 499 U.S. 962, 111 S.Ct. 1587, 113 L.Ed.2d 651 (1991).

The AMR defendants have brought legitimate claims for contribution and indemnity against ATR. And, the fact that ATR has answered the AMR complaints by, among other things, raising the affirmative defense that such claims are precluded by law and contract does not render the AMR complaints a sham. Plainly, the validity of ATR's affirmative defenses remains to be litigated.

No doubt the AMR defendants and ATR share a common interest in having this suit tried in a federal court rather than state court. But this fact alone does not collusion make for purposes of 28 U.S.C. § 1359; rather, to defeat federal jurisdiction, the collusion must involve some element of deceit or artifice. We need not concern ourselves with why these parties prefer to be in federal court so long as there is a legitimate basis for jurisdiction. *See Chicago v. Mills,* 204 U.S. 321, 330, 27 S.Ct. 286, 289, 51 L.Ed. 504 (1907) (noting that so long as a suit "is free from fraud or collusion a party's motive in preferring a federal tribunal is immaterial"). Accordingly, because plaintiffs have failed to demonstrate any fraudulent manipulation of jurisdictional facts, the Court rejects their contention that federal jurisdiction has been improperly obtained through collusion.

We now turn to consider the more substantial issues presented by the instant motions.

*"Pooling" of Ownership Interests*

■ The plaintiffs maintain that the plain language of the FSIA indicates that "foreign state" status is conferred under the Act only where a majority interest in the entity is owned by *a* foreign state, not a number of foreign states. Because ATR's removal petition states that "ATR was, and is, a separate legal person, the majority of whose shares or

other ownership interest were, and are, *owned by the governments of the countries of France and Italy ...*", plaintiffs contend that ATR cannot claim foreign state status and has pleaded itself outside of the reach of the FSIA.

In support of its position, plaintiffs rely on *Linton v. Airbus Industrie,* 794 F.Supp. 650 (S.D.Tex.1992). In *Linton,* the court held that where an entity is owned by several other entities (the "owning entities"), an owning entity may not pool its ownership interests with those of the other owning entities for purposes of calculating the total foreign state ownership of the owned entity, unless that owning entity is, itself, majority owned by a foreign state. Specifically, in *Linton,* the removing defendant (Airbus Industrie or "AI") was owned by four corporations. Two of the owning corporations, which collectively owned 42.1% of AI, were controlled unquestionably by foreign states; a third owning corporation, which owned 20% of AI was unquestionably privately owned. The fourth owning corporation (Deutsch Airbus GmbH or "DA") owned 37.9% of AI. The question addressed by the *Linton* court was articulated as follows: "[A]ssuming that pooling is allowed, the critical question is whether [DA's] interest can be pooled with the 42.1% owned by foreign states. If so then FSIA applies; otherwise it does not." 794 F.Supp. at 652. The *Linton* court's answer to this question turned on whether DA could be considered a foreign state. If it was, the court assumed that its foreign state interests in AI could be pooled with the others; on the other hand, if DA was not a foreign state, the court would not allow the foreign state interests held through DA to be pooled with the others.

DA was owned by two companies. One, unquestionably an agency of the German government, owned 20% of DA; the other, which owned 80% of DA, was a German corporation, only 36.56% of which was owned by foreign states (the remaining 63.44% was privately owned). The removing defendants in *Linton* reasoned that the overall foreign-state ownership of AI totalled slightly over 60% [42.1% + {(.2) (37.9%) = 7.58% } +

$\{(.8)\ (.3656)\ (37.9\%) = 11.08\} = 60.76\%\ ]$ [7]; hence, they argued, AI should be regarded as having a majority of its shares owned by a foreign state. The *Linton* court rejected this approach. Instead, the court reasoned that DA itself was not a foreign state because a majority of its shares was not owned by a foreign state; only 49.25% $[20\% = \{(.3656)\ (80\%) = 29.25\%\}]$ of DA's shares were owned by foreign states. 794 F.Supp. at 652. In reaching its holding that pooling would not be permitted under such circumstances, the court stated:

> [E]ven assuming that pooling is permitted, it is one thing to say that where an entity is owned by several other entities, FSIA applies to the first entity if more than 50% of its shares are owned by entities which are themselves foreign states. It is quite another thing to say that entities which are not foreign states or their instrumentalities may nevertheless pool their ownership interests in another entity such that FSIA applies to the latter.

*Id.* Thus, the court held that because DA was not majority owned by a foreign state, any foreign state ownership interests in AI derived through DA could not be pooled with other foreign state ownership interests. 794 F.Supp. at 653–54.

Plaintiffs read *Linton* as support for the broad proposition that pooling of (foreign state) ownership interests is impermissible for purposes of determining whether an entity claiming foreign state status is, in fact, majority owned by a foreign state. However, as should be clear from the foregoing account, this is not *Linton*'s holding. Although on its face *Linton* is couched in terms of pooling, the case actually presents a *tiering* question—where the issue is "whether through 'tiering'[,] a foreign state's ownership interest can be attributed [to Airbus] when that foreign state did not own a majority interest in the company that held the ownership interest in Airbus." *Linton v. Airbus Industrie*, 30 F.3d 592 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 639, 130 L.Ed.2d 545 (1994).[8] With respect to the issue of whether pooling *per se* is permissible, the *Linton* opinion equivocates. First, the court stated that it was "far from clear that pooling is allowed under FSIA", noting:

> Arguably, if Congress had wished to permit pooling, it could have easily defined a foreign state as an entity 50% or more of whose shares are owned by a foreign state or states. Because Congress did not so define foreign state, it is not for the courts to substitute this definition for the one provided.

794 F.Supp. at 652. However, shortly thereafter, the court continued:

> Obviously, FSIA applies to foreign states. Likewise under section 1603, an entity 50% or more of whose shares are owned by a foreign state is itself a foreign state. In the Court's view, although reasonable minds could disagree, it does not do too much violence to either the plain language or the spirit of FSIA to hold that foreign states may pool, their interests in an entity for purposes of determining whether that entity is a foreign state under FSIA. FSIA would unquestionably apply if any owner were a party or if more than 50% of the entity in question were owned by any single foreign state. It is not, therefore, too much of a stretch to assume that Congress intended FSIA to apply to an entity owned by several foreign states, even if no single foreign states [sic] owns a majority: a majority of the entity's stock or other ownership interest is still owned by foreign

---

7. The *Linton* court reports the figure at 60.04%. We cannot determine how the 60.04% figure was arrived at. However, this difference is immaterial for our purposes.

8. The Fifth Circuit opinion in *Linton* is not a direct appeal of the district court opinion discussed in the text. That district court opinion *was* appealed; however, the appeal was dismissed for lack of appellate jurisdiction because the district court failed to rule on the entirety of the motion before it (the defendants had also moved for dismissal for lack of personal jurisdiction and for dismissal on forum non conveniens grounds). *See Linton*, 30 F.3d at 594. On remand, as a result of certain post-remand events that apparently destroyed diversity jurisdiction (the other basis for federal subject matter jurisdiction), the district court dismissed for lack of subject matter jurisdiction. *Id.* at 595. On a second appeal, the Fifth Circuit declined to consider the FSIA issue. *See id.* at 596–98.

states to which Congress clearly intended FSIA to apply.

*Id.* at 652–53. Thus, although *Linton* sends mixed messages regarding the permissibility of pooling *per se,* it plainly does not hold pooling to be impermissible under FSIA. To the extent that *Linton* intimates that pooling of ownership interests is impermissible, we note that—although the Fifth Circuit declined to review the FSIA issue—in *dicta,* the court cast doubt on the district court's view:

> We ... observe that the district court questioned whether the interests of two or more foreign states could be combined, commenting that "pooling" appears to be foreclosed by the use of the state ("singular") in the FSIA. *Linton,* 794 F.Supp. at 652. This reasoning probably should be examined in light of the rules of statutory construction, *e.g.,* 1 U.S.C. § 1 (providing that "words importing the singular include and apply to several persons, parties, or things" unless the context indicates otherwise), and in light of the cases in which the pooling issue has been considered.

*Linton v. Airbus Industrie,* 30 F.3d 592, 598 n. 29 (5th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 639, 130 L.Ed.2d 545 (1994). And, in *Mangattu v. M/V IBN HAYYAN,* 35 F.3d 205, 207–08 (5th Cir.1994), the Fifth Circuit expressly held that foreign states could pool their ownership interests for purposes of meeting § 1603(b)(2)'s majority ownership requirement ("We hold that an entity 100% owned by foreign states, created by an agreement of all participating states, satisfies the requirements of § 1603(b)(2)"). Thus, the district court opinion in *Linton* is of very little persuasive force with respect to the pooling issue.

Also, as the court observed in *Linton,* the majority of courts confronting the issue have, either explicitly or implicitly, recognized the propriety of pooling ownership interests for purposes of determining whether an entity may be considered an agency or instrumentality of a foreign state for purposes of the FSIA. *See Linton,* 794 F.Supp. at 651 (noting "every court that has considered the issue has approved this type of pooling"). Thus, for example, in *LeDonne v. Gulf Air,*

*Inc.,* 700 F.Supp. 1400 (E.D.Va.1988), the court found that Gulf Air, Inc.—a joint stock company created by a treaty among the Emirate of Abu Dhabi, the State of Bahrain, the State of Qatar, and the Sultanate of Oman, who collectively owned 100% of Gulf Air's stock, *id.* at 1402—was an agency or instrumentality of a foreign state notwithstanding the fact that no single foreign state owned a majority of its shares. The *LeDonne* court noted:

> In plaintiff's view, the FSIA does not apply unless majority ownership vests in a single foreign state. This is an unnecessary literalism that runs counter to the Act's purpose and ignores the well-established international practice of states acting jointly through treaty-created entities for public or sovereign purposes. If the policies that animate the FSIA are to be given their full range, it must, therefore, apply to treaty-created instrumentalities jointly owned by foreign states.

*Id.* at 1406. *See also Mangattu v. M/V IBN HAYYAN,* 35 F.3d 205, 207–08 (5th Cir.1994) (finding that foreign states could pool their ownership interests and that defendant, wholly owned by six foreign sovereigns, was therefore an instrumentality of a foreign state; "We hold that an entity 100% owned by foreign states, created by an agreement of all participating states, satisfies the requirements of § 1603(b)(2)"); *Kern v. Jeppesen Sanderson, Inc.,* 867 F.Supp. 525, 530–31 (S.D.Tex.1994) (finding entity to be a foreign state under the FSIA where a majority of its shares were owned by two foreign states at one relevant time and by three foreign states at another); *Aluminum Distribs., Inc. v. Gulf Aluminum Rolling Mill Co.,* 1989 WL 64174 (N.D.Ill.1989) (following *LeDonne* and finding "that the ownership of a majority of shares by several foreign states satisfies the requirements of § 1603(b)(2)"); *In re EAL (Delaware) Corp.,* 1994 WL 828320 *4 (D.Del.1994) (same); *see also Rios v. Marshall,* 530 F.Supp. 351, 371 (S.D.N.Y.1981) (assuming without discussion that an unincorporated association serving as the representative of 11 British West Indian governments was an instrumentality of those foreign states); *but see Gardiner Stone Hunter*

*Int'l v. Iberia Lineas Aereas de Espana, S.A.*, 896 F.Supp. 125, 131 (S.D.N.Y.1995) (reasoning that pooling is only permitted where the entity in question was created by treaty or was a multinational joint venture).

We concur with the majority of courts that have permitted the pooling of ownership interests for purposes of determining whether § 1603(b)(2)'s majority ownership requirement is met. In the first place, we find that 1 U.S.C. § 1 permits reading § 1603(b)(2) as referring to majority ownership by "foreign states" rather than simply "a foreign state." Moreover, we find that the wooden reading urged by the plaintiffs would most assuredly frustrate the FSIA's objective of providing "a comprehensive jurisdictional scheme in cases involving foreign states." H.R.REP. No. 1487, 94th Cong., 2d Sess. 13 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6611. There is simply no sound policy justification for reading the FSIA to apply to an entity majority owned by one foreign state but not to apply to an entity majority owned by two or more foreign states. The sensitive concerns raised by a federal court's exercise of jurisdiction over a foreign sovereign are no less implicated in the latter context. Accordingly, we reject plaintiffs' argument that pooling is impermissible.

*"Tiering" of Ownership Interests*

■ That does not end our inquiry, however, because this case does not simply involve pooling; in addition, a tiering of ownership interests is involved. As ATR's evidence indicates, France and Italy's respective fifty percent ownership interests in ATR are not direct ownership interests. Instead, these two governments "own" ATR through intermediary corporate entities. As set forth above, ATR's undisputed evidence indicates that fifty percent of ATR is owned by the French government aerospace concern SNIA. SNIA, in turn, is 91.42% owned by the French government in the following manner: 62.16% is owned by the French government directly; 20% of SNIA is owned by Sogepa, a wholly owned holding entity of the French government; and, 17.81% of SNIA is owned by Crédit Lyonnais Industria, which, in turn, is wholly owned by Credit Lyonnais, which is at least 52% owned by the French

government. The declaration of Philippe Simon, Deputy General Counsel for SNIA, and the supporting materials, indicate that SNIA, Sogepa, Credit Lyonnais Industria, and Credit Lyonnais are all separate juridical entities formed under French law. A copy of a "K–BIS" Abstract from the Court of Commerce of Paris, France is attached to Simon's declaration. That Abstract reflects that five of SNIA's directors represent the French State through various ministries (*i.e.*, defense, economy, transportation) and one represents Sogepa.

The other fifty percent of ATR is owned by Alenia, a division of Finmeccanica S.p.A. The declaration of Alenia's Legal Counsel, Roberto Camiz details Alenia's ownership structure. Alenia is a division of Finmeccanica S.p.A. Finmeccanica, described by Camiz as "an Italian government national industrial concern acting in the aerospace field through Alenia" is, in turn, majority (at least 62%) owned by Instituto Per La Ricostruzione Industriale ("I.R.I."), a wholly owned holding entity of the Italian government. Camiz states that "[a]ll of the capital stock of I.R.I. is represented by a single share owned by the Italian state through the Ministry of the Treasury." Camiz Decl. ¶ 8. Camiz further states that Finmeccanica and I.R.I. are separate juridical entities formed under Italian law. *Id.* ¶¶ 6, 7. Accompanying Camiz's declaration are copies of Finmeccanica and I.R.I.'s Certificates of Registration evidencing their separate juridical existence and Finmeccanica's Certificate also confirms that Alenia is a division of Finmeccanica.

The issue raised by plaintiffs is whether France and Italy may "tier" their ownership interests through corporate intermediaries such as SNIA and Alenia. We conclude that they may. Until very recently, courts have uniformly considered majority state-owned corporations to be agencies or instrumentalities of foreign states for FSIA purposes even where the state ownership was only indirect. *See, e.g., Delgado v. Shell Oil Co.*, 890 F.Supp. 1315, 1318 n. 5 (S.D.Tex.1995) (finding defendant Dead Sea Bromine Co. Ltd. to be a agency or instrumentality of Israel because Israel owned a majority of its shares

and noting "[t]he fact that Israel's ownership interest in Dead Sea is 'indirect' because Dead Sea is a wholly owned subsidiary of an entity in which Israel owns an indirect majority interest is immaterial"); *Talbot v. Saipem A.G.*, 835 F.Supp. 352, 353 n. 2 (S.D.Tex. 1993) (finding defendant Saipem S.p.A. to be a foreign state where it was owned indirectly (third-tier) by Italy's Ministry of Treasury through a chain of intermediary corporations and noting "[t]hat Saipem's ownership by the Italian government is indirect is immaterial"); *Trump Taj Mahal Assocs. v. Costruzioni Aeronautiche Giovanni Agusta S.p.A.*, 761 F.Supp. 1143, 1150 (D.N.J.1991) (finding defendant Augusta S.p.A. to be a foreign state under § 1603(b)(2) despite the fact that its link to the Italian government was "triple-tiered"), *aff'd without opinion,* 958 F.2d 365 (3d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992); *Rutkowski v. Occidental Chem. Corp.,* 1988 WL 107342 (N.D.Ill.1988) (finding defendant Asbestos Corp. Ltd. ("ACL") to be a foreign state under § 1603(b)(2) despite the fact that Quebec's ownership of ACL was tiered through two other corporations); *cf. Credit Lyonnais v. Getty Square Assocs.,* 876 F.Supp. 517 (S.D.N.Y.1995) (applying § 1603(b)(2) in the context of 28 U.S.C. § 1332(a)(4) and permitting the pooling of direct French ownership interests in defendant deriving through an intermediary corporation).[9]

Permitting ownership interests to be tiered for purposes of determining whether a defendant is entitled to foreign state status under § 1603 follows from § 1603's definition of a foreign state. A foreign state "includes ... an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). An "agency or instrumentality of a foreign state," in turn, is defined as

> any entity—(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority

of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b). Thus, under § 1603(b)(2), if Corporation $X$ is directly majority-owned by a foreign state it constitutes "an agency or instrumentality of a foreign state," and therefore, under § 1603(a), it is a "foreign state." If Corporation $X$, in turn, owns the majority of shares of Corporation $Y$, Corporation $Y$ is, by definition, both owned by a foreign state [§ 1603(a) ] and is a foreign state [§ 1603(b)(2) ]. This Court's reading of § 1603(b)(2) in conjunction with § 1603(a) leads to the conclusion that so long as the corporate intermediaries standing between a foreign state and a defendant seeking to invoke foreign state status are themselves majority-owned by a statutorily-defined "foreign state" (which, to be explicit, includes an agency or instrumentality of a foreign state), such tiering of ownership interests will not deprive the defendant of foreign state status.

Recently, in *Gates v. Victor Fine Foods,* 54 F.3d 1457 (9th Cir.1995), *cert. denied,* — U.S. ——, 116 S.Ct. 187, 133 L.Ed.2d 124 (1995), the Ninth Circuit rejected such an analysis, concluding that an entity wholly owned by "an agency or instrumentality of a foreign state" is not owned by a "foreign state or political subdivision thereof" and hence does not meet the definition of § 1603(b)(2). *Id.* at 1462. The *Gates* court reasoned that the term "foreign state" could not be equated with the term "agency or instrumentality" for two reasons. First, the court observed that "the statute provides that a foreign state *includes* an agency or instrumentality, not that it *is* an agency or instrumentality or that it *is defined* as an

---

9. Even in *Linton,* discussed *supra,* the court did not reject tiering *per se.* Rather, the court held that tiering would not be allowed where the corporate intermediary through which Germany's ownership interests derived was not majority owned by foreign states. The central holding of *Linton* was that Deutsch Airbus GmbH ("DA") was not a "foreign state" because it was not

majority owned by foreign states and therefore Germany's ownership interests in Airbus Industrie ("AI") deriving through DA could not be pooled with other foreign ownership interests in AI: "FSIA does not apply to Airbus Industrie and Aeroformation because Deutsch Airbus GmbH is not a foreign state for purposes of FSIA." *Linton,* 794 F.Supp. at 653–54.

agency or instrumentality." *Id.* Respectfully, we find this observation to be of very little force. By its heading, § 1603 purports to provide "Definitions" of terms used in the FSIA. *See* 28 U.S.C. § 1603 (captioned "Definitions"); *see also* H.R.REP. No. 1487, 94th Cong., 2d Sess. 15 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6613 ("Subsection (a) *defines* the term foreign state *as used in all provisions* of [the Act]") (emphasis added). Moreover, other sections of the Act plainly recognize that § 1603 sets forth determinative definitions of the term foreign state; for instance, the FSIA's jurisdictional provision provides that "The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state *as defined in section 1603(a) of this title.*" 28 U.S.C. § 1330(a) (emphasis added). The fact that § 1603 uses the expression "includes" does not alter the conclusion that the section sets out the scope of the intended meaning of the term foreign state as used throughout the Act. The plain meaning of this definitional provision, as informed by its legislative history, is that where the term foreign state occurs in the Act it is to be read as including agencies and instrumentalities of the foreign state. We decline to ignore this clear definitional provision.

The *Gates* court also reasoned that the term foreign state, as used in § 1603(b)(2) could not be equated with "an agency or instrumentality of a foreign state" because:

> If Congress had intended "agencies or instrumentalities of a foreign state" to mean "a foreign state" for the purposes of section 1603, then it also would have intended "a political subdivision" to mean "a foreign state" because section 1603(a) defines a foreign state as including both "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." The statutory language strongly indicates that Congress did not intend this interpretation, however, because the remainder of the section differentiates between "foreign states" and "political subdivisions thereof."

*Gates,* 54 F.3d at 1462. In this regard, the court observed that § 1603(b)(2) speaks of "an organ of a foreign state *or political subdivision thereof*" and the court further observed that the House Report's analysis of this section also distinguishes between foreign states and political subdivisions thereof:

> The second criterion requires that the entity be either an organ of a foreign state (*or of a foreign state's political subdivision*), or that a majority of the entity's shares or other ownership interest be owned by a foreign state (*or by a foreign state's political subdivision*). If such entities are entirely owned by a foreign state, they would of course be included within the definition. Where ownership is divided between a foreign state and private interests, the entity will be deemed to be an agency or instrumentality of a foreign state only if a majority of the ownership interests (shares of stock or otherwise) is owned by a foreign state *or by a foreign state's political subdivision.*

*Gates,* 54 F.3d at 1462 (quoting H.R.REP. No. 1487, 94th Cong., 2d Sess. 15 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6614) (emphasis added). Insofar as the *Gates* court is highlighting the fact that the references to "a foreign state's political subdivision" in the statute and House Report are entirely superfluous given that § 1603 defines a foreign state to include its political subdivisions, this Court agrees. We respectfully do not agree, however, that this superfluous reference to political subdivisions compels the conclusion that the term foreign state as used in § 1603(b)(2) was intended by Congress to refer only to the sovereign states themselves and not their agencies or instrumentalities. Such a conclusion flies in the face of both the plain language of § 1603(a) as well as the House Report's analysis of § 1603(a), wherein the House Judiciary Committee observed:

> Subsection (a) defines the term foreign state as used in all provisions of chapter 97 [the "Jurisdictional Immunities of Foreign States" chapter of the United States Code], except section 1608. In section 1608, the term 'foreign state' refers only to the sovereign state itself.

H.R.REP. No. 1487, 94th Cong., 2d Sess. 15 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6613. Here, in quite clear terms, the committee, specifies that subsection (a)'s defini-

tion applies "in all provisions" of the Act except § 1608—there, and only there, "the term 'foreign state' refers only to the sovereign state itself." The *Gates* court's suggestion that the term foreign state as used in § 1603(b)(2) refers only to the sovereign state itself cannot be reconciled with this clear statement of legislative intent, nor the language of the statute itself. Moreover, in view of Congress' clear statement that § 1603's definition of foreign state applies "except as used in section 1608," we find it inconceivable that Congress intended to nullify that definition in the section immediately following it through the roundabout method of including a reference to political subdivisions and inviting the reader to rely on the canon of statutory construction *expressio unis est exclusio alterius* ("Expression of one thing is the exclusion of another"). Moreover, the absence of any legislative history suggesting that Congress actually intended to override its definition of foreign state through this roundabout means buttresses our conclusion.

Rather, we conclude that the term foreign state as used in § 1603(b)(2) includes the agencies or instrumentalities of a foreign state. Although it is less than clear, we surmise that Congress included the superfluous reference to a "political subdivision" in § 1603(b)(2) for emphasis rather than to alter the definition of the term foreign state and that Congress omitted explicit (and equally superfluous) reference to agencies or instrumentalities in § 1603(b)(2) because it would render the definition of "agency or instrumentality of a foreign state" circular—defining the term by way of referring to the term. Thus, while the *Gates* court was certainly correct that Congress "could easily have stated that [in order to be deemed an agency or instrumentality of a foreign state] an entity must be owned by a foreign state, a political subdivision *or an agency or instrumentality* of a foreign state or political subdivision," *Gates,* 54 F.3d at 1462, to do so

would have introduced an unnecessary circularity into the statute. In view of the many other drafting shortcomings of the Act, the avoidance of this circularity is to be applauded.

Although the *Gates* court's analysis has an arguable foundation, we believe that its conclusion is inconsistent with the plain language of the Act as well as its legislative history. It would appear that the *Gates* decision was driven, in some part, by its concern that:

> [A] contrary reading of the statute could expand immunity far beyond what Congress intended. As it is written, the Act provides immunity to entities that are either organs of a foreign state or political subdivision thereof or have a majority of shares owned by the foreign state or political subdivision. To add to that list entities that are owned by an agency or instrumentality would expand the potential immunity considerably because it would provide potential immunity for every subsidiary in a corporate chain, no matter how far down the line, so long as the first corporation is an organ of the foreign state or political subdivision or has a majority of its shares owned by the foreign state or political subdivision.

*Id.* We believe that this Court's proper role is to give effect to what we perceive to be Congress' plain language and intent, and to leave the legitimate concerns raised by the *Gates* court to the arena where they should be resolved—the legislative and executive branches of our government. Moreover, we note that the *Gates* court, like this Court, professes to be giving effect to "a literal reading of the statute," *id.;* however, that court's literal reading is achieved only by nullifying a key definitional provision of the Act and ignoring the House Judiciary Committee's analysis of that definitional provision. Therefore we respectfully decline to follow it.[10]

---

10. Plaintiffs suggest that this Court could avoid the Seventh Amendment issues addressed later in this opinion simply by following *Gates'* construction of § 1603. For, if the sort of tiering involved here is impermissible, then ATR has no claim to foreign state status, the FSIA is inapplicable, and the Seventh Amendment concerns drop out of the picture. Indeed, plaintiffs urge

Because we find that an entity that is majority owned by an agency or instrumentality of a foreign state meets the definition of a foreign state under the FSIA, we further find that tiering of ownership interests is perfectly permissible for purposes of determining whether an entity is entitled to foreign state status under the Act.[11] Contrary to the plaintiffs' contentions, we do not believe that permitting *both* pooling and tiering, as we do in the present case, so far removes the foreign state from the entity named as the defendant as to unduly expand the scope of the FSIA beyond that contemplated by Congress. In the first place, permitting pooling does nothing to "remove" or "distance" the foreign state from the entity. The ownership interests in the entity are no more remote whether the entity is owned by one foreign state or several. It is only tiering that permits the ownership interests of the foreign sovereign to become, in some sense, remote. However, as we have seen, this possibility derives from the language of the Act and we have neither the authority nor the inclination to rework the statute.[12]

In view of all of the foregoing considerations, we find that ATR is a foreign state as defined by the FSIA. Accordingly, we find

that this Court has subject matter jurisdiction over these related cases under 28 U.S.C. § 1330 and § 1441 and removal of the state court actions to federal court was therefore proper. Plaintiffs' arguments that ATR was engaged in commercial activity and is therefore not entitled to immunity are misplaced in the instant remand motions. Whether ATR is entitled to immunity or is exempt from immunity under the commercial activity exception is a matter for another day. The threshold question, is simply whether ATR is entitled to foreign state status under the Act, permitting it to remove these actions from state court. The answer, again, is yes.

We turn next to consider the difficult question of whether, in those cases where ATR is only named as a third-party defendant, removal of the entire action (as opposed to only the third-party action) is appropriate.

*Scope of Removal*

■ In view of the foregoing analysis, we conclude that the state court actions naming ATR as a defendant were properly removed to federal court by ATR under the FSIA. The analysis is more complicated with respect to those actions in which ATR was not named as a defendant in the underlying state court action but rather was impleaded into the action by being named as a third-party defendant by the AMR defendants. The

11. We note that in an earlier opinion, the Seventh Circuit, without any detailed discussion of the issue, stated that two entities owned indirectly by France through an intermediate corporation constituted a foreign state for FSIA purposes. *See Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.,* 10 F.3d 425, 427 (7th Cir. 1993) (stating that the district court's jurisdiction over "two Zenith entities" was proper under the FSIA, where it appears from the opinion that the "Zenith entities" were owned indirectly by France through Group Bull whose parent, Compagnie des Machines Bull, is 90 percent owned by the French state).

upon this Court that it is duty bound to follow this course. *See Richmond Screw Anchor Co. v. United States,* 275 U.S. 331, 346, 48 S.Ct. 194, 198, 72 L.Ed. 303 (1928) ("It is [this Court's] duty in the interpretation of federal statutes to reach a conclusion which will avoid serious doubt of their constitutionality."); *see also Hooper v. California,* 155 U.S. 648, 657, 15 S.Ct. 207, 211, 39 L.Ed. 297 (1895) ("The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."); *Rust v. Sullivan,* 500 U.S. 173, 190, 111 S.Ct. 1759, 1770–71, 114 L.Ed.2d 233 (1991); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988); *United States v. Jin Fuey Moy,* 241 U.S. 394, 401, 36 S.Ct. 658, 659, 60 L.Ed. 1061 (1916). Quite mindful of our duty to avoid a Constitutional infirmity, we nevertheless decline to follow *Gates.* In view of our reservations concerning the *Gates* analysis we cannot justify following *Gates* to avoid the Constitutional question. Moreover, as we demonstrate below, the Seventh Amendment problem may just as readily be avoided through other means.

12. Our limited role is to give effect to what we perceive Congress' intent to be. For a very critical appraisal of the FSIA's effect, through § 1603(b), of conferring foreign sovereign status "on any corporation owned in whole or part by one or more foreign states regardless of the nature of its activities," see William C. Hoffman, *The Separate Entity Rule in International Perspective: Should State Ownership of Corporate Shares Confer Sovereign Status for Immunity Purposes?,* 65 TUL.L.REV. 535 (1991) (hereinafter "Hoffman").

plaintiffs contend that only the third-party action—not the underlying action—may be removed to federal court and that removing the underlying action under the FSIA would infringe their Seventh Amendment right to a jury trial. We address the Seventh Amendment issues in the next section.

In analyzing the proper scope of removal under the FSIA, we must begin by reviewing the Act's jurisdictional and removal provisions. The FSIA's jurisdictional provision states:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity....

28 U.S.C. § 1330(a). The Act's removal provision states:

> Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury.

28 U.S.C. § 1441(d).

Courts construing this language have reached conflicting conclusions with respect to the proper scope of removal under the FSIA. *Compare In re Surinam Airways Holding Co.*, 974 F.2d 1255 (11th Cir.1992) (holding that the underlying claims against the nonforeign state defendant as well as the third-party claims against the foreign defendant may be removed), *Nolan v. Boeing Co.*, 919 F.2d 1058 (5th Cir.1990) (same), *cert. denied*, 499 U.S. 962, 111 S.Ct. 1587, 113 L.Ed.2d 651 (1991), *Lopez del Valle v. Gobierno de la Capital*, 855 F.Supp. 34, 36–37 (D.Puerto Rico 1994) (same), *Teledyne, Inc. v. Kone Corp.*, 892 F.2d 1404 (9th Cir.1989) (holding that 28 U.S.C. § 1441(d) conferred jurisdiction over the entire civil action not just the claims against the foreign state in a suit in which a foreign state was named as a defendant along with nonforeign-state code-

fendants) and *Arango v. Guzman*, 621 F.2d 1371 (5th Cir.1980) (same) *with Schlumberger Indus., Inc. v. National Sur. Corp.*, 36 F.3d 1274 (4th Cir.1994) (holding that 28 U.S.C. § 1330(a) does not confer pendent party jurisdiction over nonforeign-state codefendants) *and Alifieris v. American Airlines, Inc.*, 523 F.Supp. 1189 (E.D.N.Y.1981) (holding that only the third-party complaint against the foreign state may be removed and remanding claims outside the third-party complaint to state court). As the Seventh Circuit recently observed, "[t]he majority view is that the statute authorizing the removal of suits against a foreign state, 28 U.S.C. § 1441(d), authorizes the removal of the entire case, even if there are nonforeign defendants." *Alonzi v. Budget Constr. Co.*, 55 F.3d 331, 333 (7th Cir.1995). This has been held to be the case in actions involving foreign-state as well as nonforeign-state defendants, *see e.g., Teledyne; Arango, supra*, and in cases involving foreign states brought into the case solely as third-party defendants, *see, e.g., Surinam Airways; Nolan, supra*. The Seventh Circuit has yet to resolve the issue for this circuit. *Alonzi*, 55 F.3d at 333–34. By and large, the arguments for and against extending removal to the entire action and not just the claims against the foreign state have been amply set out in the foregoing opinions. We now turn to an examination of the reasoning in those opinions. Because the reasoning is essentially the same in all cases on either side of the split, we will confine our discussion to representative cases.

In *Nolan v. Boeing Co.*, 919 F.2d 1058 (5th Cir.1990), *cert. denied*, 499 U.S. 962, 111 S.Ct. 1587, 113 L.Ed.2d 651 (1991), the Fifth Circuit addressed the scope of removal under § 1441(d) in a context quite similar to that presented here. In *Nolan*, sixteen personal injury suits were filed in state court by the representatives of the estates of the decedents and injured passengers who were killed or injured in the crash of a Boeing 737–400 aircraft. The plaintiffs named as defendants the designer and manufacturer of the aircraft (Boeing); the designer and man-

ufacturer of portions of the aircraft's engines (General Electric Company); and another defendant that had participated in the marketing of the aircraft's engines. Boeing subsequently obtained leave of the state court to file third-party demands for contribution and indemnification against Societe Nationale d'Etude et de Construction de Moteurs d'Aviation, S.A. (SNECMA), a French Government-owned concern that manufactured the aircraft's engines. Thereafter, SNECMA removed the sixteen suits to federal district court under § 1441(d). The plaintiffs sought remand to the state court contending that, at most, SNECMA was entitled to remove the third-party claims only, not the entire action. The district court denied the motion to remand and the Fifth Circuit affirmed.

The Fifth Circuit analyzed the issue as one of "pendent party" jurisdiction—that is, assuming that removal of the third-party claims were proper, did the federal district court properly possess pendent party jurisdiction over the underlying action. The court's analysis was framed by the Supreme Court's then recent opinion in *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), in which the Court held that there is no pendent party jurisdiction under the Federal Tort Claims Act ("FTCA") and cast doubt on the availability of pendent party jurisdiction generally. Congress responded to the *Finley* decision by enacting 28 U.S.C. § 1367(a) [13], which "codifie[d] pendent jurisdiction under the name 'supplemental jurisdiction,' expressly including pendent party jurisdiction." *Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1181 (7th Cir.1993). By extending federal jurisdiction "to all claims sufficiently related

to the claim on which its original jurisdiction is based to be part of the same case or controversy within the meaning of Article III of the Constitution," *id.,* section 1367(a) extends supplemental jurisdiction "to the constitutional limit." *Id.* at 1182. Because *Finley's* reservations concerning pendent party jurisdiction have now been largely met by § 1367(a), much of *Nolan's* discussion is superfluous at this point, nevertheless, *Nolan's* analysis is instructive.[14]

The *Nolan* court began its analysis by noting that there was no constitutional obstacle to exercising pendent party jurisdiction over the underlying actions because the parties to those actions possessed "minimal diversity," which is all that is constitutionally required. *See State Farm Fire & Casualty Co. v. Tashire,* 386 U.S. 523, 531, 87 S.Ct. 1199, 1204, 18 L.Ed.2d 270 (1967) (finding that "Article III poses no obstacle to the legislative extension of federal jurisdiction, founded on diversity, so long as any two adverse parties are not co-citizens"). In the instant case, as in *Nolan,* the parties to the underlying state court actions possess minimal diversity.

Having determined that there was no constitutional impediment to adjudicating the underlying action, the *Nolan* court next considered whether there was adequate statutory authority—for, as the court observed, Article III specifies the "outer limits of federal subject matter jurisdiction [and] [w]ithin those limits ... the federal courts are authorized to hear only those cases that Congress by statute authorizes them to hear." *Nolan,* 919 F.2d at 1064. Accordingly, the court noted that "the question becomes one of statutory construction—*i.e.,* whether section 1441(d) authorized removal not only of Boeing's third-party claims against the foreign sovereign SNECMA, but also of plaintiffs' main claims." *Id.* In concluding that § 1441(d) does authorize removal of the un-

---

13. *See* Judicial Improvements Act of 1990, Pub.L. 101–650, which, among other things, statutorily overruled *Finley* by providing that district courts have "supplemental jurisdiction" over "all claims that are so related ... that they form part of the same case or controversy," including claims involving "the joinder or intervention of additional parties." 28 U.S.C. § 1367(a).

14. Indeed, most of the opinions addressing the issue we now confront were decided on the state of the law under *Finley.* To the extent that § 1367(a) now expressly confers "pendent party jurisdiction," the conclusion that federal courts may properly exercise jurisdiction over all claims in an action involving a foreign sovereign (even where some of the claims are asserted against nonforeign-sovereign parties) is bolstered.

derlying action, the court relied on several considerations. First, the language of § 1441(d) provides that *"Any civil action* brought in a state court against a foreign state ... may be removed by the foreign state to the district court of the United States...."* 28 U.S.C. § 1441(d) (emphasis added). The *Nolan* court contrasted this language with that of the FTCA (which was at issue in *Finley* and found not to confer pendent party jurisdiction [15]) and observed that "the FSIA [unlike the FTCA] grants jurisdiction to the federal courts over 'action[s]' and not just over 'claims.'" *Nolan* at 1064. Thus, the court concluded that the language of § 1441(d) "is broad enough to extend federal court subject matter jurisdiction over the entire action in which the foreign state is a party, rather than simply over the 'claims' in that action which are specifically asserted against the foreign state." *Id.; accord Surinam Airways Holding Co.,* 974 F.2d at 1259 (finding that "the use of 'any civil action' in § 1441(d) was clearly meant to grant removal jurisdiction over more than just the 'claims' asserted against a foreign state"); *see also Teledyne Inc. v. Kone Corp.,* 892 F.2d 1404, 1409 (9th Cir.1989) (noting that the phrase "any civil action" is broad enough to embrace the entire action and "tends to affirmatively exclude the sort of unspoken qualification [*viz.,* "and no one else"] read into the statute in *Finley* ").

Next, the court reasoned that the purpose and structure of the FSIA militate in favor of the conclusion that § 1441(d) should effect removal of the entire action to federal court. As courts and commentators have observed, a central purpose of the FSIA was "to establish uniform procedures for litigation against foreign States, their agencies and instrumentalities in the United States." Mark B. Feldman, *The United States Foreign Sovereign Immunities Act of 1976 in Perspective: A Founder's View,* INT'L & COMP.L.Q. 302, 305 (1986); *see also* 14 CHARLES A. WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3662 (1985) (observing that Congress intended § 1330's broad grant of jurisdiction to promote uniformity of decision in actions involving foreign governments); Rebecca J. Simmons, Note, *Nationalized and Denationalized Commercial Enterprises Under the Foreign Sovereign Immunities Act,* 90 COLUM.L.REV. 2278, 2294 (1990) (noting that a "critical ... purpose of the FSIA was to impose order and uniformity" on United States law relating to immunities of foreign nations); Kimberly K. Hill, Note, *Foreign Government–Owned Corporations, the Foreign Sovereign Immunities Act, and the Right to a Jury Trial,* 1982 DUKE L.J. 1071, 1074 (1982) (noting that a principal objective of the FSIA is to ensure that the doctrine of restrictive immunity will be applied uniformly in United States courts); *Williams v. Shipping Corp. of India,* 653 F.2d 875, 879 (4th Cir.1981) ("Both the statutory language and the legislative history [of the FSIA] evince the congressional decision to achieve uniformity of decisional law in the area of suits against foreign sovereigns."), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982). This purpose could be thwarted, the *Nolan* court reasoned, if a foreign government could remove only the third-party action that named it as a defendant and not the underlying action:

> the interest of a sovereign third-party defendant in removing the entire case may be more compelling [than that of a foreign sovereign named as a co-defendant (in which context courts have almost unanimously held that the entire action may be removed) ], because its liability is logically dependant on the liability of a defendant in the main action. To protect itself fully, a third-party defendant like SNECMA could be called on to assert defenses on behalf of

---

**15.** In *Finley,* the Supreme Court reasoned:

> The FTCA, § 1346(b), confers jurisdiction over "civil actions on claims against the United States." It does not say "civil actions on claims that include requested relief against the United States," nor "civil actions in which there is a claim against the United States"—

formulations one might expect if the presence of a claim against the United States constituted merely a minimum jurisdictional requirement, rather than a definition of the permissible scope of FTCA actions.... [W]e conclude that "against the United States" means against the United States and no one else.

*Finley,* 490 U.S. at 552, 109 S.Ct. at 2008.

Boeing.... The outcome of the main suit very much affects SNECMA's rights. *Nolan*, 919 F.2d at 1065 (citations omitted). *See also Surinam Airways*, 974 F.2d at 1259 (noting "[i]f a foreign state lacks the ability to remove an entire case to federal court, then the goals of the Foreign Sovereign Immunities Act will be frustrated when that foreign sate is brought into an action as third-party defendant and is denied, for all practical purposes, to fully litigate its liability in federal court").

Finally, the *Nolan* court relied on the Act's legislative history to buttress its conclusion. In particular, the court quoted the House Judiciary Committee Report on the Act which states in pertinent part:

> In view of the potential sensitivity of actions against foreign states and the importance of developing a uniform body of law in this area, it is important to give foreign states clear authority to remove to a Federal forum actions brought against them in the State courts. New subsection (d) of section 1441 permits the removal of any such action at the discretion of the foreign state, even if there are multiple defendants and some of these defendants desire not to remove the action or are citizens of the State in which the action has been brought.

H.R.REP. No. 1487, 94th Cong., 2d Sess. 32 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6631. The court also highlighted the Committee's observation that the FSIA prescribes "the jurisdiction of U.S. district courts in cases involving foreign states...." H.R.REP. No. 1487, 94th Cong., 2d Sess. 12 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 6610. With respect to the former passage, the court reasoned that the Committee's focus "on 'actions' rather than 'claims,' ... reinforces the view that the FSIA grants federal jurisdiction over entire cases where a foreign state is a party." *Nolan*, 919 F.2d at 1065; *accord Surinam Airways*, 974 F.2d at 1259. And, this Court would add that the Committee's explicit remarks concerning removal "even if there are multiple defendants

and some of these defendants desire not to remove the action" make quite plain the Congressional intent that *all* claims, not just those against the foreign state, would be removed. With respect to the second excerpt from the Committee Report, the court observed that the wording—the use of the phrase "cases involving foreign states" in particular—"is indistinguishable from language that the Supreme Court in *Finley* suggested was broad enough to create pendant party jurisdiction." *Id.* at 1065–66; *accord Surinam Airways*, 974 F.2d at 1259; *see also Teledyne*, 892 F.2d at 1409 ("This formulation is virtually indistinguishable from examples given by the Supreme Court of language broad enough to create pendent party jurisdiction.").[16]

In contrast to the holdings in *Nolan, Teledyne,* and *Surinam Airways*, the Fourth Circuit recently held that the FSIA's original jurisdiction provision, 28 U.S.C. § 1330(a), does not confer pendent party jurisdiction over nonforeign state codefendants in an action in which one of the named defendants is a foreign state. *Schlumberger Indus., Inc. v. National Sur. Corp.*, 36 F.3d 1274 (4th Cir. 1994). Because *Schlumberger*'s holding was principally predicated on the FSIA's original jurisdiction provision, 28 U.S.C. § 1330(a), and not its removal provision, 28 U.S.C. § 1441(d), *Schlumberger* is not directly at odds with the former cases. However, the Fourth Circuit also addressed § 1441(d) and concluded that § 1441(d) also failed to confer jurisdiction over the nonforeign-state codefendants and the court's reasoning there plainly conflicts with that of *Nolan, Teledyne,* and *Surinam Airways*. So, we review *Schlumberger* here to see what light it sheds, if any, on the issue of the scope of removal jurisdiction under § 1441(d).

In *Schlumberger*, the plaintiff brought a declaratory judgment suit in South Carolina state court against a number of insurance companies that had issued it comprehensive general liability policies to determine the insurers' rights and responsibilities in connec-

---

**16.** This Court would further add that the Committee's explicit remarks concerning removal "even if there are multiple defendants and some of these defendants desire not to remove the

action" make quite plain the Congressional intent that *all* claims, not just those against the foreign state, would be removed.

tion with certain environmental clean-up costs incurred by the plaintiff. The suit could not be filed in federal court because there was not complete diversity between the parties. However, one of the named defendants, The Insurance Company of Ireland ("ICI") removed the case under § 1441(d). The plaintiff then voluntarily dismissed ICI and moved to remand the case in view of the absence of federal question or diversity jurisdiction. The remand motion was denied and the suit continued, ultimately resulting in summary judgment in favor of the defendant insurers. The plaintiff appealed. After initially voting to certify the liability issue to the Supreme Court of South Carolina, the Fourth Circuit raised the issue of whether there was a defect in the district court's subject matter jurisdiction. Assuming that federal jurisdiction over ICI was proper under either 28 U.S.C. § 1330(a) or 28 U.S.C. § 1441(d), the court observed:

> The problem arises with respect to the district court's subject matter jurisdiction over the claims against the defendants ... other than ICI. Jurisdiction over the claims against these parties could only have been pendent party jurisdiction and under the Supreme Court's opinion in *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), the district court lacked proper pendent party jurisdiction.

*Schlumberger,* 36 F.3d at 1278. The court then proceeded to consider "the vitality of pendent party jurisdiction under the FSIA in *Finley*'s wake." *Id.* at 1279.

Because the suit had proceeded to completion below without objection to removal, the court confined its principal jurisdictional analysis to whether the district court would have had original jurisdiction of the case under § 1330(a). In this respect, the court was following what it considered to be the holding of *Grubbs v. General Electric Credit Corp.,* 405 U.S. 699, 92 S.Ct. 1344, 31 L.Ed.2d 612 (1972), wherein the Supreme Court stated, "where after removal a case is tried on the merits without objection and the federal court enters judgment, the issue in subsequent proceedings on appeal is not whether the case was properly removed, but

whether the federal district court would have had original jurisdiction of the case had it been filed in that court." *Grubbs,* 405 U.S. at 702, 92 S.Ct. at 1347. Because original jurisdiction over the claims against ICI was premised on § 1330(a), the *Schlumberger* court examined whether that section allows for pendent party jurisdiction.

The court began its analysis by highlighting that § 1330(a) grants original jurisdiction to the district courts over "any nonjury civil action against a foreign state ... *as to any claim for relief* in personam with respect to which the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a) (emphasis added). The court noted that this language, like the statutory language at issue in *Finley,* "extends subject matter jurisdiction only as to claims brought against a foreign sovereign and not to claims against other parties." *Schlumberger,* 36 F.3d at 1280. The court determined that "[t]his phrasing is almost identical to the phrasing 'civil actions on claims against the United States,' which the Court in Finley found did not confer pendent party jurisdiction." *Id.* at 1281. The court claimed further support for its conclusion in the Judiciary Committee's section-by-section analysis of the FSIA wherein the Committee explained: "The jurisdiction [conferred by § 1330(a) ] extends *to any claim* with respect to which the foreign state is not entitled to immunity." H.R.Rep. No. 1487, 94th Cong., 2d Sess. 13 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6611 (emphasis added).

Based on the foregoing, the *Schlumberger* court concluded that § 1330(a) did not confer pendent party jurisdiction over nonforeign-state codefendants. The court proceeded, however, to explain why its conclusion that there is no pendent party jurisdiction under the FSIA would remain the same even if § 1440(d) were the source of subject matter jurisdiction over the foreign-state defendant. First, the court suggested that "it is possible that jurisdiction under section 1441(d) is coextensive with jurisdiction under section 1330(a)," 36 F.3d at 1282, in which case, under the court's prior analysis, there would be no pendent party jurisdiction. Thereafter, the *Schlumberger* court's analysis becomes somewhat equivocal, for the court ap-

pears to concede that § 1441(d) authorizes pendent party jurisdiction, but, under the circumstances, the district court improperly exercised such jurisdiction: "Even if ... jurisdiction under section 1441(d) is broader than that under section 1330(a) and allows, in appropriate cases, for some form of pendent party jurisdiction, we think that the district court's exercise of pendent party jurisdiction here was without basis." *Id.* at 1282–83. The court observed that the sole purpose of § 1441(d) was to give a nonimmune foreign sovereign defendant access to federal court, and that in the case at bar ICI, the foreign sovereign defendant, was dismissed out of the case before the district court even had a chance to rule on its entitlement to immunity. Under these circumstances—where no policy of § 1441(d) would be served by retaining the action in federal court—the court concluded that remand was mandated. *Id.* at 1283. Finally, the court noted that " '[b]ecause removal jurisdiction raises significant federalism concerns, we must strictly construe removal jurisdiction.' " *Id.* (quoting *Mulcahey v. Columbia Organic Chemicals Co.,* 29 F.3d 148, 151 (4th Cir.1994)). Thus, because removal jurisdiction in the case was doubtful, in the court's view, remand was necessary. *Id.*

As should be evident from this review of *Schlumberger*'s analysis of § 1441(d), the court did not find, much less hold, that § 1441(d) does not authorize pendent party jurisdiction. Indeed, the court was quick to emphasize the limited nature of its holding: "We emphasize that we do not here decide when, if ever, and, if so, to what extent, pendent party jurisdiction will accrue under section 1441(d). We hold only that where, as here, a purported foreign sovereign defendant who has filed for removal under that section is dismissed from the case before the federal court has had an opportunity otherwise to exert authority over the case, the district court retains no pendent party jurisdiction over the remaining domestic defendants." *Id.* at 1284–85.

Contrary to *Nolan* and its progeny, *Schlumberger* demonstrates that the lan-

guage and legislative history of the FSIA can also be read so as to support the conclusion that federal court jurisdiction under the FSIA is limited to those claims brought against the foreign sovereign and that the FSIA does not confer pendent party jurisdiction. For a variety of reasons, this Court declines to follow *Schlumberger* in this regard and instead shall join with those courts that have concluded that jurisdiction under the FSIA's removal provision extends to the entire civil action, not just the claims against the foreign sovereign.

First, *Schlumberger* was expressly decided under the authority of *Finley,* which has now been legislatively overruled. *See Schlumberger,* 36 F.3d at 1279 ("We now consider the vitality of pendent party jurisdiction under the FSIA in *Finley*'s wake."); *see also id.* n. 9 (noting that newly enacted § 1367 "has no application" because the case was commenced prior to the effective date of the Judicial Improvement Act of 1990).[17] Thus, insofar as § 1367 now expressly provides for "pendent party jurisdiction," the analysis driven by *Finley* is unwarranted. Second, *Schlumberger* rested principally on an analysis of § 1330(a) [FSIA's original jurisdiction provision] not § 1441(d) [FSIA's removal provision], which is at issue here; and, the *Schlumberger* court comes close to conceding that jurisdiction under the removal provision may be broader than that conferred under the original jurisdiction provision:

> With respect to the FSIA, several factors suggest that Congress intended removal jurisdiction to be broader than original jurisdiction and to confer some form of pendent party jurisdiction. First, the language of section 1441(d) is more accommodating to pendent party jurisdiction than is that of section 1330(a). Section 1441(d) does not include the limiting language "as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity," which is contained in section 1330(a). Second, the legislative

---

**17.** Footnote 9 in the *Schlumberger* opinion contains an obvious typographical error reading that the Judicial Improvements Act was enacted *prior* to the removal of the state court action to federal court. However, it is clear from the context, as well as the court's recitation of the facts, that the court intended to state that the Act was enacted *after* the removal.

history underlying section 1441(d) seems clearly to confirm such an intent ...

36 F.3d at 1282 n. 17. Although, as we have recounted above, the court ultimately reached the same conclusion even under a § 1441(d) analysis, that conclusion was highly dependent on the unique facts of the case (namely, that the foreign defendant was dismissed out of the case before any of the merits of the case were ever reached) and the court expressly limited its § 1441(d) holding to those facts. Those facts, of course, are not present here. Finally, and most fundamentally, we concur with the views expressed in *Nolan* and *Surinam, see supra,* that the goals of the FSIA could be thwarted by limiting federal district court jurisdiction to only those claims directed against a foreign-sovereign defendant (or foreign-sovereign third-party defendant). Accordingly, we conclude that in those cases in which ATR is named only as an impleaded third-party defendant, it may properly remove the entire civil action, including the underlying action against the non-ATR defendants to federal court.

*Seventh Amendment Issues*

Thus far, we have concluded that ATR meets the FSIA's statutory definition of a foreign sovereign and that, under the FSIA, it is entitled to remove the entire civil action filed in state court to federal court. Here, we run headlong into a potential confrontation with the Seventh Amendment. In particular, we must consider whether the FSIA violates the plaintiffs' Seventh Amendment right to a jury trial by legislatively defining foreign government owned corporations to be "foreign states" and therefore subject to trial only by the Court and not a jury. Then, in view of our determination that ATR may remove the entire civil action, we consider whether plaintiffs' are thereby impermissibly stripped of their Seventh Amendment right to a jury trial against the nonforeign sovereign defendants.

1. *Right to Jury Trial in Suits Against Foreign–State Owned Corporations*

▉] The Seventh Amendment provides "In suits at common law, where the value shall exceed twenty dollars, the right of trial by jury shall be preserved...." U.S. CONST. amend. VII. In *Curtis v. Loether,* 415 U.S. 189, 193, 94 S.Ct. 1005, 1008, 39 L.Ed.2d 260 (1974), the Court observed that while "the thrust of the Amendment was to preserve the right to jury trial as it existed in 1791, it has long been settled that the right extends beyond the common-law forms of action recognized at that time." Building on *Curtis*'s theme, in *Pernell v. Southall Realty,* 416 U.S. 363, 375, 94 S.Ct. 1723, 1729, 40 L.Ed.2d 198 (1974), the Court explained, "Whether or not a close equivalent to [the statutory cause of action at issue] existed in England in 1791 is irrelevant for Seventh Amendment purposes, for that Amendment requires trial by jury in actions unheard of at common law, provided that the action involves rights and remedies of the sort traditionally enforced in an action at law, rather than in an action in equity or admiralty." With these principles in mind, we turn to consider whether the nonjury provisions of the FSIA violate the Seventh Amendment.

At the outset, we note—as ATR is quick to point out—that all of the courts of appeal that have considered whether the FSIA violates the Seventh Amendment have concluded that it does not. *See Ruggiero v. Compania Pervana De Vapores "Inca Capac Yupanqui",* 639 F.2d 872 (2d Cir.1981); *Rex v. Cia. Pervana De Vapores, S.A.,* 660 F.2d 61 (3d Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982); *Williams v. Shipping Corp. of India,* 653 F.2d 875 (4th Cir.1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982); *Universal Consolidated Cos., Inc. v. Bank of China,* 35 F.3d 243 (6th Cir.1994); *Arango v. Guzman Travel Advisors,* 761 F.2d 1527 (11th Cir.), *cert. denied,* 474 U.S. 995, 106 S.Ct. 408, 88 L.Ed.2d 359 (1985); *cf. Goar v. Compania Pervana De Vapores,* 688 F.2d 417, 424–27 (5th Cir.1982) (holding that plaintiff had no Seventh Amendment right to a jury trial in a direct action suit against the insurer of a foreign state). All of the foregoing decisions fundamentally rest on the proposition that the common law in 1791 did not recognize a cause of action against a foreign sovereign. And, we do not question the truth of that proposition.

We believe, however, that the foregoing decisions fail to address an important distinction. It must be borne in mind that the FSIA extends the jury-immunity of the foreign sovereign to any corporation (or other business entity regardless of form) that is majority owned by a foreign sovereign. It is with regard to this extension, that we believe the FSIA may run afoul of the Seventh Amendment. For, from the premise that the common law did not recognize a cause of action against a foreign sovereign, it does not necessarily follow that the common law did not recognize an action against a corporation owned in whole or part by the foreign sovereign. With the sole exception of Judge Sloviter's dissenting opinion in *Rex*, we are aware of no opinion that addresses this issue. Accordingly, on September 18, 1995, this Court issued a minute order directing the parties to submit additional briefing addressing the following:

> Does the FSIA violate the Seventh Amendment right to a jury trial by legislatively defining foreign government owned corporations to be "foreign states" and therefore subject to trial only by the Court and not a jury. The focus here is not on whether the plaintiffs have a Seventh Amendment right to a jury trial against a foreign state, but rather, whether the FSIA unconstitutionally narrows plaintiffs' right to a jury trial by bringing within the definition of a "foreign state" entities other than the foreign sovereign itself. In ordering further briefing on this issue, the Court expects the parties to provide more than the basic proposition that "at common law suits against foreign sovereigns were unknown hence there is no Seventh Amendment right to jury trial against a foreign sovereign." The parties are specifically directed to address the bearing on this issue of the Supreme Court's opinion in *Bank of the United States v. Planter's Bank of Georgia*, 22 U.S. (9 Wheat.) 904, 907 [6 L.Ed. 244] (1824) (Marshall, C.J.) (holding a government controlled corporation not immune from suit), [and whether

the rule announced in that case] is relevant and controlling.

*In re Roselawn Air Crash*, No. 95 C 4593 (Sept. 18, 1995 Minute Order).[18] Additionally, pursuant to 28 U.S.C. § 2403(a) and Fed. R.Civ.P. 24(c), this Court certified the issue to the Attorney General and afforded the United States the opportunity to intervene if it so chose. On November 7, 1995, the United States notified the Court that it would not intervene or otherwise participate in this case with respect to the constitutional issue before the Court.

Before exploring the issue raised in this Court's minute order of September 18, we shall briefly review the existing decisions upholding the constitutionality of the FSIA vis-a-vis the Seventh Amendment. Actually, it is probably sufficient to review only Judge Friendly's seminal decision in *Ruggiero v. Compania Pervana De Vapores "Inca Capac Yupanqui"*, 639 F.2d 872 (2d Cir.1981), as the subsequent decisions simply parallel and follow that decision. *Ruggiero* involved three consolidated appeals. In each, the plaintiffs were longshoremen seeking damages under the Longshoremen's and Harbor Workers' Compensation Act for personal injuries allegedly resulting from various shipowners' negligence. The defendants were shipping companies incorporated under the laws of and wholly owned by foreign governments—Peru, Poland, and Indonesia. In each case the plaintiff had made a jury demand and the defendant moved to strike it pursuant to the FSIA. The district court granted the motion to strike and certified the issue for interlocutory appeal. The Second Circuit affirmed.

After rejecting the plaintiffs' argument that they could maintain their suits under § 1332(a)(2) (which did not, by its terms, preclude a jury trial), and concluding that § 1330(a) provided the exclusive source of jurisdiction over a suit against a foreign state, 639 F.2d at 875, Judge Friendly turned to consider whether the FSIA's prohibition against jury trials in actions against foreign states violates the Seventh Amendment.

**18.** Due to a transcription error, the bracketed material was inadvertently omitted from the min-

ute order.

The opening proposition in Judge Friendly's analysis is, "It is undisputed that a suit against a foreign state was unknown to the common law." *Id.* at 878. The rest, as the saying goes, is commentary. As support for this proposition Judge Friendly relied on Chief Justice Marshall's opinion in *The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812), and the subsequent Supreme Court opinion in *Berizzi Bros. Co. v. S.S. Pesaro,* 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088 (1926). The issue presented in *The Schooner Exchange* was whether a military vessel owned by France that had come into the United States' territorial waters during a time of peace was subject to an action *in rem* in an American court. Justice Marshall concluded that it was not, stating:

> The world being composed of distinct sovereignties, possessing equal rights and independence, whose mutual benefit is promoted by intercourse with each other, ... all sovereigns have consented to a relaxation in practice ... of that absolute and complete jurisdiction within their respective territories which sovereignty confers.
>
> . . . . .
>
> ... One sovereign being in no respect amenable to another; and being bound by obligations of the highest character not to degrade the dignity of his nation, by placing himself or its sovereign rights within the jurisdiction of another, can be supposed to enter a foreign territory only under an express license, or in the confidence that the immunities belonging to his independent sovereign station, though not expressly stipulated, are reserved by implication, and will be extended to him.

11 U.S. at 136–37. He continued, "It seems then to the court to be a principle of public law that national ships of war, entering a port of a friendly power open for their reception, are to be considered as exempted by the consent of that power from its jurisdiction." *Id.* at 145–46. Fourteen years later, in *Berizzi Bros. Co. v. S.S. Pesaro,* 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088 (1926), the Court extended the *Schooner Exchange* holding to vessels of a foreign state used for commercial purposes. *See id.* at 574, 46 S.Ct. at 612.

Based on these decisions, Judge Friendly concluded: "We have been pointed to nothing to show that a right of jury trial existed under the common law in 1791 with respect to a suit against a foreign government or an instrumentality thereof; such a suit could not be maintained at all." *Ruggiero,* 639 F.2d at 879.

Judge Friendly also analogized to situations in which the United States had waived its immunity to suit but had not provided for a jury trial and the Supreme Court found no Seventh Amendment violation in such jury-immunity because under the common law in 1791 there was no right to a jury trial in a suit against the sovereign. *See McElrath v. United States,* 102 U.S. 426, 26 L.Ed. 189 (1880) ("Suits against the government ... are not controlled by the Seventh Amendment. They are not suits at common law within its true meaning."); *Galloway v. United States,* 319 U.S. 372, 388, 63 S.Ct. 1077, 1086, 87 L.Ed. 1458 (1943) ("It hardly can be maintained that under the common law in 1791 jury trial was a matter of right for persons asserting claims against the sovereign.") After citing these case, Judge Friendly observed, "A suit against a foreign state was just as much unknown to the common law of 1791 as was a suit against the United States." *Ruggiero,* 639 F.2d at 880.

Finally, Judge Friendly noted that just as it is rational for the United States to couple its waiver of sovereign immunity (when it chooses to do so) with a refusal to submit itself to a jury trial, it is equally rational for Congress to couple a withdrawal of sovereign immunity from foreign states with the same protection (*viz.,* jury-immunity):

> Surely one reason why the United States has coupled its waiver of sovereign immunity in certain types of cases with a refusal to submit itself to jury trial was the fear that juries might draw too heavily on a deep pocket.... By the same token Congress could legitimately consider that a partial withdrawal of sovereign immunity from foreign states would interfere with United States' international relations unless such states were accorded protection similar to what it had given itself.

*Id.*

It should be evident from this discussion of *Ruggiero* that its holding that the FSIA does

not violate the Seventh Amendment begins and ends with the proposition that at common law in 1791 suits against a foreign sovereign were unknown. Despite the fact that the cases before him involved defendant corporations that were wholly owned by foreign states (as opposed to defendants which were, themselves, foreign states), Judge Friendly never paused to consider whether suits against corporations owned in whole or part by a foreign sovereign were known at common law.

The other court of appeals opinions upholding constitutionality of the FSIA in the face of Seventh Amendment challenges are essentially no different. *Williams v. Shipping Corp. of India,* 653 F.2d 875 (4th Cir. 1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982), like *Ruggiero,* was a longshoreman's suit involving a defendant shipping corporation that was wholly owned by a foreign government. After removing the action from state court, the defendant moved to strike the plaintiff's jury demand and the motion was granted. The Fourth Circuit affirmed. The *Williams* opinion essentially parallels that of *Ruggiero,* beginning with citation to *The Schooner Exchange* and *Berizzi Bros.* for the purpose of setting up the proposition, "We think it is manifestly clear that in 1791 a suit against a foreign government could not be maintained in either the courts of America or England." 653 F.2d at 881–82. The court then noted its accord with the observations of Judge Friendly and concluded that " 'suits against foreign sovereigns, authoritatively determined to have been unknown to the common law in 1791, are *sui generis* and should not be deemed to be within the scope of the Seventh Amendment's preservation of jury trial.' " *Id.* at 883 (quoting *Ruggiero,* 639 F.2d at 880–81). Again, as in *Ruggiero,* despite the fact that the defendant was a corporation wholly owned by a foreign sovereign— not a foreign sovereign itself—the court did not offer any assessment of whether this distinction affected the force of its analysis.

We need not add unnecessarily to this already lengthy opinion by reviewing *Arango, Bank of China,* and *Goar* individually just to establish that these opinions parallel

and follow *Ruggiero* in all pertinent respects and like *Ruggiero* fail to distinguish between defendants that are themselves foreign sovereigns and defendants that are corporations owned in whole or part by a foreign sovereign. *See Arango,* 761 F.2d at 1534; *Bank of China,* 35 F.3d at 244–45; *Goar,* 688 F.2d at 424–27. We note that in *Arango,* one lone sentence proclaims that "[t]he same immunity [as that afforded the sovereign itself] extended to commercial entities owned by foreign governments." 761 F.2d at 1534. However, as support for this proposition, *Arango* cites *Berizzi Bros. Co. v. S.S. Pesaro,* 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088 (1926), in which the Supreme Court extended the holding of *The Schooner Exchange* (that military vessels owned by a foreign sovereign were immune from American court jurisdiction) to vessels owned and operated by a foreign sovereign for commercial purposes. *Berizzi* did not present facts involving jurisdiction over a corporation owned by a foreign sovereign.

We do not lump the Third Circuit's opinion in *Rex v. Cia. Pervana De Vapores, S.A.,* 660 F.2d 61 (1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982), among the others because it takes a slightly different approach to the issue. Rather than simply asking, as the Second and Fourth Circuits had done, whether a suit against a foreign sovereign was recognized at common law in 1791—an approach rejected by the Third Circuit as "static"—the *Rex* court framed the inquiry as "whether Rex's claim is a 'Suit at common law,' but we do not view common law as frozen in 1791." 660 F.2d at 66. The court elaborated: "the proper inquiry is . . . whether his action is in the nature of a legal remedy similar to a suit at common law. To answer this question, we must examine the law relating to private actions against foreign sovereigns." *Id.* at 67. The court's analysis then traverses familiar ground. First, citing *The Schooner Exchange* and *Berizzi* and after reviewing the development of the so-called restrictive theory of immunity in this country, the court stated: "History thus conclusively demonstrates that actions against foreign sovereigns have never existed at common law. . . . The law of liability of foreign sovereigns is, as the second circuit con-

cluded, *sui generis. Ruggiero,* 639 F.2d at 881. We regard it as a unique species of public law." *Id.* at 68. The court then turned to consider the effect, if any, of the FSIA's codification of the restrictive theory of sovereign immunity on the common law status of actions against a foreign sovereign. Because the FSIA effected a codification of executive branch policy rather than a cause of action at common law, the court concluded that the Seventh Amendment was not offended:

> [W]e cannot conclude that by codification Congress has created a cause of action in the nature of a common law remedy. Congress explicitly determined, upon recommendation of the executive branch and for reasons of policy similar to those that have counselled past judicial deference to the executive, that no jury should intervene in an action under the FSIA. Inasmuch as the FSIA does not codify a preexisting cause of action at common law, that determination does not offend the seventh amendment....

> We hold, therefore, that a suit against a foreign sovereign in district court pursuant to the FSIA is not a suit at common law within the meaning of the seventh amendment, and therefore the denial of jury trial in the Act does not violate the Constitution.

*Id.* at 69.

Although *Rex* frames the inquiry slightly different, its analysis, like that in *Ruggiero, Williams, Arango* and the others fails to distinguish between suits against the sovereign itself and suits against a corporation owned by the sovereign. As Judge Sloviter illustrates in his dissent in *Rex,* this distinction has been historically observed and can be traced back at least as far as Justice Marshall's opinion in *Bank of the United States v. Planters' Bank of Georgia,* 22 U.S. (9 Wheat) 904, 6 L.Ed. 244 (1824). Drawing on this historical tradition, which we shall discuss momentarily, Judge Sloviter observed:

> It is important ... that we recognize that there has been a distinction historically observed between the foreign sovereign itself and its ownership interests....

When foreign state-owned corporations began to be formed, they were not accorded presumptive immunity from suit. More often than not, such corporations were amenable to suit and in no case was ownership determinative.

> .    .    .    .    .

> ... Thus the relevant case law demonstrates that corporations such as the defendant in this case were subject to suit prior to the FSIA. *The majority's reliance on the immunity from suit of the foreign state itself is not to the contrary but is, rather, simply irrelevant.*

*Rex,* 660 F.2d at 72–73 (Sloviter, J., dissenting) (emphasis added). Indeed, as Judge Sloviter correctly recounts, several federal district court opinions from the 1920s refused to confer immunity on foreign corporations owned or controlled by foreign governments. In *Coale v. Societe Co-operative Suisse des Charbons,* 21 F.2d 180, 180–81 (S.D.N.Y. 1921), Judge Augustus Hand stated, "if the Swiss government chose to do its business by means of the Societe, the latter, as a corporate entity, was liable for its corporate obligations. I find no case which holds otherwise." Similarly, in *United States v. Deutsches Kalisyndikat Gesellschaft,* 31 F.2d 199, 202 (S.D.N.Y.1929), the court stated, "A suit against a corporation is not a suit against a government merely because it has been incorporated by direction of the government, and is used as a governmental agent, and its stock is owned solely by the government." *See also Commercial Pacific Cable Co. v. Philippine Nat'l Bank,* 263 F. 218 (S.D.N.Y.) (banking corporation majority owned by Philippine government not immune to suit), *aff'd on other grounds,* 269 F. 1022 (2d Cir.1920).

Undergridding Judge Sloviter's dissent in *Rex,* as well as this Court's concerns regarding the constitutionality of the FSIA's conferral of jury-immunity to foreign government owned corporations, is "a consistent line of authority in the Supreme Court, the lower federal courts, and state courts, holding that the attributes of sovereignty, including immunity, are not conferred upon a corporation by the mere fact of governmental ownership." *Rex,* 660 F.2d at 73 (Sloviter, J. dissenting). The line of authority to which

Judge Sloviter refers dates back to *Bank of the United States v. Planters' Bank of Georgia*, 22 U.S. (9 Wheat.) 904, 6 L.Ed. 244 (1824), in which Chief Justice Marshall offered the seminal statement of what has been come to be known as the "separate entity doctrine." *See* Hoffman, *supra* note 11, at 544 n. 49. In *Planters' Bank*, the State of Georgia had incorporated, and was a part shareholder of, the Planters' Bank of Georgia. When the Bank argued that the States ownership of some of its shares entitled it to Eleventh Amendment immunity, Justice Marshall soundly rejected the argument, and held instead that the Bank was a separate legal entity. We quote:

A suit against the Planters' Bank of Georgia, is no more a suit against the State of Georgia, than against any other individual corporator....

... The suit is against a corporation, and the judgment is to be satisfied by the property of the corporation, not by that of the individual corporators. The State does not, by becoming a corporator, identify itself with the corporation. The Planters' Bank of Georgia is not the State of Georgia, although the State holds an interest in it.

... As a member of a corporation, a government never exercises its sovereignty. It acts merely as a corporator, and exercises no other power in the management of the affairs of the corporation, than expressly given by the incorporating act....

... We think, then, that the Planters' Bank of Georgia is not exempt from being sued in the federal Courts, by the circumstance that the State is a corporator.

22 U.S. at 906–08. In what is, perhaps, the most direct passage, Justice Marshall stated:

It is, we think, a sound principle, that when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those whom it associates itself, and takes the character which belongs to

its associates, and to the business which is to be transacted.

*Id.* at 907.

As one commentator has noted, "*Planters' Bank* firmly entrenched in American law the rule that a state-owned corporation does not enjoy sovereign status." Hoffman, *supra* note 11, at 544. The separate entity rule was followed in numerous cases by the Supreme Court as well as lower federal and state courts over the course of the next century. *See Bank of the Commonwealth of Kentucky v. Wister*, 27 U.S. (2 Pet.) 318, 7 L.Ed. 437 (1829) (finding that the question of the Bank's amenability to suit was "no longer open" after *Planters' Bank* even though in the instant suit, the State of Kentucky was the sole stockholder); *United States v. Strang*, 254 U.S. 491, 493–94, 41 S.Ct. 165, 166, 65 L.Ed. 368 (1921) ("a state, when it becomes a stockholder in a bank, imparts none of its attributes of sovereignty to the institution; this is equally the case, whether it own a whole or a part of the stock of the bank"); *Providence Eng'g Corp. v. Downey Shipbldg. Corp.*, 294 F. 641, 647–57 (2d Cir. 1923) (collecting cases), *cert. denied*, 264 U.S. 586, 44 S.Ct. 334, 68 L.Ed. 862 (1924); *see generally* Hoffman, *supra* note 11, at 543–51 (discussing the separate entity rule and collecting cases); John Thurston, *Government Proprietary Corporations*, 21 VA.L.REV. 351, 372–91 (1935) (collecting cases and noting, "The Planters' Bank and Commonwealth Bank cases have repeatedly been cited in later cases involving the same question, and it may be regarded as well settled that a corporation is not immune from suit by reason of the fact that the government holds part or all of its stock. For the purpose of suit, the corporation is regarded as a separate entity from the government."). Indeed, as recently as 1983, the Supreme Court cited *Planters' Bank* with approval, albeit in a different context, in an opinion examining whether the Banco Para el Comerico Exterior de Cuba (Bancec) should be considered a separate juridical entity from the Republic of Cuba, which supplied all of its capital and owned all of its stock. *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 103 S.Ct. 2591, 77

L.Ed.2d 46 (1983). Although the Court ultimately held that the presumption of separate juridical status had been overcome under the particular facts presented in that case, the Supreme Court plainly embraced the principle that corporations owned by foreign governments are generally treated as separate legal entities from the governments that own them. *See id.* at 624–28, 103 S.Ct. at 2599–2601. The Court explained:

> Increasingly during this century, governments throughout the world have established separately constituted legal entities to perform a variety of tasks.... A typical government instrumentality ... is created by an enabling statute that prescribes the powers and duties of the instrumentality.... The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued.

> . . . . .

> Separate legal personality has been described as "an almost indispensable aspect of the public corporation." [Friedmann, *Government Enterprise: A Comparative Analysis*, in GOVERNMENT ENTERPRISE: A COMPARATIVE STUDY 303, 314 (W. Friedmann & J. Garner eds. 1970).] Provisions in the corporate charter stating that the instrumentality may sue and be sued have been construed to waive the sovereign immunity accorded to many governmental activities, thereby enabling third parties to deal with the instrumentality knowing that they may seek relief in the courts.[16]

---

[16] ... This principle has long been recognized in courts in common-law nations. See *Bank of United States v. Planters' Bank of Georgia*, 9 Wheat. 904 [6 L.Ed. 244] (1824); *Tamlin v. Hannaford*, [1950] 1 K.B. 18, 24 (C.A.).

... Due respect for the actions taken by foreign sovereigns and for principles of comity between nations ... leads us to conclude—as the courts of Great Britain have concluded in other circumstances—that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such.

*First Nat'l City Bank,* 462 U.S. at 624–27, 103 S.Ct. at 2599–2600.

It is against this backdrop that this Court directed the parties to submit additional briefing, specifically directing them to address whether the rule announced in *Planters' Bank* is relevant and controlling. *See also* Committee on Int'l Litig., Commercial & Fed.Litig. Section, N.Y. State Bar Ass'n, *A Foreign State Defendant's Right to Trial by Jury Under the Foreign Sovereign Immunities Act,* 26 TEX.INT'L L.J., 71 (1991) ("The *Planters' Bank* decision does undercut Judge Friendly's Seventh Amendment analysis."). We note that the declarations submitted by ATR state that both I.R.I. and its wholly owned entity Finmeccanica (whose Alenia division owns 50% of ATR) as well as SNIA (the French government concern that owns the other 50% of ATR) are "separate juridical entit[ies]." *See* Giobbe Decl. ¶¶ 4, 5; Camiz Decl. ¶¶ 3, 7; Simon Decl. ¶ 3. Thus, we are led to the conclusion that, under the *Planters' Bank* rule, ATR has no claim to immunity deriving from France's and Italy's sovereign immunity. Under *Planters' Bank* and its progeny France and Italy are not conduits through which their immunity flows to ATR.

The foregoing, however, does not end our inquiry. The Seventh Amendment question with which we are concerned requires this Court to ascertain, so far as possible, the state of the common law in 1791. *Planters' Bank* was decided in 1824. Although there is ample authority indicating that, after 1824, a corporation owned by a foreign government and acting for commercial rather than governmental purposes was amenable to suit. This Court has been directed to no authority indicating that the rule stated in *Planters' Bank* had any origins in the common law as of 1791. Instead, it would appear that *Planters' Bank* marked a departure from the earlier general rule of absolute sovereign immunity. We note in this regard the statement of Lord Wilberforce in *I Congreso del Partido,* [1983] A.C. 244:

> I can now try to state the English law: ... Until 1975 it would have been true to say that England, almost alone of influential trading nations ... continued to adhere to

a pure, absolute, doctrine of state immunity in all cases.

*Id.* at 261. Although this Court has located English cases, mostly from the twentieth and late-nineteenth centuries applying a "separate entity" type rule to cases involving corporations formed under various acts of the Crown, *see, e.g., Roper v. Works & Public Bldgs. Commissioners,* [1915] 84 L.J.R. 219, 1 K.B. 45 (permitting a breach of contract action to proceed against the commissioners); *Graham & Sons v. Works & Public Bldgs. Commissioners,* [1901] 70 L.J.R. 860, 2 K.B. 781 (same), we have located no cases applying such a rule in the international context. And, we have certainly located no decision suggesting that such a rule would have been operative at common law in 1791. This conclusion is corroborated by the Hoffman article cited above. *See* Hoffman, *supra* note 11, at 551–52.

Thus, although this Court, like Judge Sloviter, finds the *Planters' Bank* rule to be quite relevant, it does not take us beyond the significant threshold that would require us to conclude that the FSIA violates the Seventh Amendment by conferring jury-immunity on corporations owned by foreign sovereigns. Although the question presents a very close call, in the final analysis, we have no conclusive evidence that common law courts in 1791 would have treated a suit against a corporation owned by a foreign sovereign as anything but a suit against the foreign sovereign itself. Although the common law appears to have significantly changed in the nineteenth century so as to permit a cause of action to proceed against a foreign-state owned corporation under the "separate entity rule," we believe that that is not the pertinent inquiry. We are, of course, aware that in considering a claim of right to trial by jury under the Seventh Amendment we are not to regard common-law forms of action as frozen in 1791. However, we believe that the principle embodied in *Curtis* and *Pernell* that the Seventh Amendment encompasses forms of action not in existence in 1791 does not permit unlimited extension of the right to trial by jury under the facts presented by this case. It is significant that the Supreme Court qualified its statement that the Seventh "Amendment requires trial by jury in actions un-

heard of at common law" with the limitation, "provided that the action involves rights and remedies of the sort traditionally enforced in an action at law, rather than in an action in equity or admiralty," *Pernell,* 416 U.S. at 375, 94 S.Ct. at 1729 (citing *Curtis,* 415 U.S. at 195, 94 S.Ct. at 1009). *Curtis* and *Pernell* both involved statutory causes of action and the focus of the analysis was on whether the statutes at question created "legal rights and remedies enforceable in an action for damages in the ordinary courts of law." *Curtis,* 415 U.S. at 194, 94 S.Ct. at 1008. Here, there is no question that the rights sought to be enforced by the plaintiffs are legal in nature. Rather, the issue is whether plaintiffs' efforts in bringing suit against an instrumentality of a foreign government is an "action ... traditionally enforced in an action at law" in 1791. The answer, we have come to conclude, is no. Therefore, following *Ruggiero, Rex, Arango, Williams, Bank of China,* and *Goar,* we must conclude that since a suit against a foreign sovereign was unknown at common law, the FSIA does not violate the Seventh Amendment by conferring jury-immunity upon corporations owned by foreign sovereigns. The Fifth Circuit summarized the pertinent analysis well in *Goar* as follows:

> Our holding does not rest on the assumption that the seventh amendment is inapplicable to all causes of action that were unrecognized at common law in 1791. The historical test we apply is flexible and may require a jury in a new cause of action, not in existence in 1791, if it involves rights and remedies of the sort traditionally enforced in an action at law or if its nearest historical analogue is an action at common law.... But this flexible approach does not require a jury here. The cases that have required jury trials for new causes of action have involved legislative enhancement or creation of rights and duties in circumstances where the common law enforced similar rights and duties.... They did not involve removal or modification of blanket immunity, which creates enforceable rights and duties in circumstances where none existed before.... In 1791 there was simply *no* analogue, of the sort

described, to a negligence action against a foreign sovereign.

688 F.2d at 427 (citations omitted).

In reaching this decision, we are mindful of the Supreme Court's characterization of judging the constitutionality of an Act of Congress as "the gravest and most delicate duty that [a] Court is called upon to perform." *Blodgett v. Holden*, 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206 (1927) (Holmes, J.); *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 319, 105 S.Ct. 3180, 3188, 87 L.Ed.2d 220 (1985); *Rostker v. Goldberg*, 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981). Moreover, this Court further notes its "due regard to the fact that [it] is not exercising a primary judgment but is sitting in judgment of those who also have taken the oath to observe the Constitution." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 164, 71 S.Ct. 624, 644, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring); *see also Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *Walters*, 473 U.S. at 319, 105 S.Ct. at 3188. It is with regard to these observations that we conclude, based on all the available information we have reviewed, that the application of the FSIA to the facts of this case does not offend the Constitution.

## 2. *Plaintiffs' Right to Jury Trial Against the Nonforeign Sovereign Defendants*

■ In view of this Court's determination, in accord with *Surinam Airways, Nolan, Teledyne,* and *Arango, see supra,* that ATR is entitled to remove the entire civil action, including claims against codefendants and the underlying actions in cases in which ATR is named only as a third-party defendant, we

must consider whether the plaintiffs are nevertheless entitled to a jury trial against the nonforeign sovereign defendants.[19] It will be recalled that the FSIA's removal provision states:

> Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury.

28 U.S.C. § 1441(d).

Plaintiffs contend that they unquestionably have a right to jury trial with respect to their claims against the nonforeign state defendants and that any construction of this provision that would deny them this right would offend the Seventh Amendment. We agree. Furthermore, plaintiffs argue that a construction of the phrase "[a]ny civil action" as encompassing the entire case (including claims against codefendants and the underlying actions in cases in which ATR is named only as a third-party defendant)—as we have construed the phrase for purposes of determining the scope of removal—forecloses any construction of the removal provision that would permit a jury trial against the nonforeign sovereign defendants while holding a bench trial against ATR.[20] Here, we disagree. Although they do not do so explicitly, it is apparent that plaintiffs rely on the canon of statutory construction that "[t]he same language used repeatedly in the same connection is presumed to bear the same meaning throughout the statute." *See* Karl N. Llewellyn, *Remarks on the Theory of Appellate Decision and The Rules or Canons About How Statutes are to be Construed,* 3

---

**19.** The Court's September 18 minute order directed the parties to submit additional briefing on this issue as follows:

> In those cases in which ATR is named only as a third-party defendant, if the FSIA's removal provision requires removal of the entire civil action including plaintiffs' underlying claims, does this violate plaintiffs' Seventh Amendment rights to a jury trial on their underlying claims—which indisputably are not claims against a foreign state. *See Schlumberger In-*

*dus., Inc. v. National Sur. Corp.,* 36 F.3d 1274, 1283 n. 17 (4th Cir.1994).

*In re Roselawn Air Crash,* No. 95 C 4593 (Sept. 18, 1995 Minute Order).

**20.** *See* Certain Plaintiffs' Supplemental Reply at 5 ("Quite simply, if the term 'action' means the 'entire case' in the first sentence of Section 1441(d), governing the scope of the foreign state's removal rights, it must mean the same thing in the second sentence, which requires that the removed action be tried without a jury.")

VAND.L.REV. 395, 404 (1950).[21] Of course, as Professor Llewellyn observed, the invocation of that canon is readily met with the parry, "This presumption will be disregarded where it is necessary to assign different meanings to make the statute consistent." *Id.; see also Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 608–09, 76 L.Ed. 1204 (1932) (observing that words may be variously construed even "when used more than once in the same statute or even in the same section" and noting that the presumption of same word same meaning is not rigidly applied; "Where the subject matter to which the words refer is not the same in the several places in which they are used ... or the scope of the legislative power exercised in one case is broader than that exercised in another, the meaning well may vary to meet the purposes of the law"); *Calderon v. Witvoet,* 999 F.2d 1101, 1104 (7th Cir.1993). This rejoinder is even more powerful when assigning different meanings to the same language avoids a construction of the statute that renders its constitutionality questionable.

As all of the parties have reminded this Court when it has served their respective purposes, "It is [this Court's] duty in the interpretation of federal statutes to reach a conclusion which will avoid serious doubt of their constitutionality." *Richmond Screw Anchor Co. v. United States,* 275 U.S. 331, 346, 48 S.Ct. 194, 198, 72 L.Ed. 303 (1928); *see also Hooper v. California,* 155 U.S. 648, 657, 15 S.Ct. 207, 211, 39 L.Ed. 297 (1895) ("The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."); *Rust v. Sullivan,* 500 U.S. 173, 190, 111 S.Ct. 1759, 1771, 114 L.Ed.2d 233 (1991) ("The principle enunciated in [*Hooper* ], ... and subsequent cases, is a categorical one: 'as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which would save the Act.'" (quoting *Blodgett v. Holden,* 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206 (1927))); *Edward J. DeBartolo Corp. v. Flor-*

*ida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988) ("This cardinal principle has its roots in Chief Justice Marshall's opinion for the Court in *Murray v. The Charming Betsy,* 2 Cranch 64, 118, 2 L.Ed. 208 (1804), and has so long been applied by this Court that it is beyond debate."); *Chapman v. United States,* 500 U.S. 453, 464, 111 S.Ct. 1919, 1927, 114 L.Ed.2d 524 (1991); *Public Citizen v. United States Dept. of Justice,* 491 U.S. 440, 465–66, 109 S.Ct. 2558, 2572–73, 105 L.Ed.2d 377 (1989); *Gomez v. United States,* 490 U.S. 858, 864, 109 S.Ct. 2237, 2241, 104 L.Ed.2d 923 (1989); *United States v. Jin Fuey Moy,* 241 U.S. 394, 401, 36 S.Ct. 658, 659, 60 L.Ed. 1061 (1916).

This Court believes that the word "action" as used in the second sentence of § 1441(d) may reasonably be read to refer only to the claims asserted against the foreign sovereign and that such a reading not only comports with legislative intent but also serves to avoid raising serious questions about the FSIA's constitutionality. We are, of course, mindful that the admonition to avoid unconstitutionality is "qualified by the proposition that 'avoidance of a difficulty will not be pressed to the point of disingenuous evasion,'" *Rust v. Sullivan,* 500 U.S. at 191, 111 S.Ct. at 1771 (quoting *George Moore Ice Cream Co. v. Rose,* 289 U.S. 373, 379, 53 S.Ct. 620, 622, 77 L.Ed. 1265 (1933)); however, as we explain below, attributing two different meanings to the word "action" entails no such evasion. Accordingly, this Court shall adopt the procedure followed by many other federal courts in FSIA cases of trying the claims against the foreign sovereign to the bench and empaneling a jury for the other defendants. *See, e.g., Gould v. Aerospatiale Helicopter Corp.,* 40 F.3d 1033, 1034–35 (9th Cir.1994); *Adkins v. GAF Corp.,* 923 F.2d 1225, 1226–27 (6th Cir.1991) (implicitly recognizing the propriety of parallel jury-nonjury procedure); *Matthews v. CTI Container Transport Int'l Inc.,* 871 F.2d 270 (2d Cir.1989) (same); *Lopez del Valle v. Gobierno de la Capital,* 855 F.Supp. 34, 36–37 (D. Puerto Rico 1994);

**21.** This principle also underlies the Fourth Circuit's observation in *Schlumberger* that construing the phrase "civil action" in the first sentence of § 1441(d) would raise "serious constitutional questions." 36 F.3d at 1283 n. 17.

*Mori v. Port Authority of New York & New Jersey,* 100 F.R.D. 810, 812 (S.D.N.Y.1984); *Diodato v. Turecamo Coastal & Harbor Towing, Inc.,* 100 F.R.D. 756, 758 (S.D.N.Y. 1984) (empaneling a jury for all issues but treating jury verdict concerning foreign sovereign as advisory only); *Outboard Marine Corp. v. Pezetel,* 461 F.Supp. 384, 396 (D.Del. 1978).

This Court acknowledges that the propriety of this procedure rests on a reading of § 1441(d) that attributes different meanings to the phrase "any civil action" as used in the first sentence of the section and "the action" as used in the second sentence. However, as the court explained in *Gould,* this reading appears to be consistent with Congress' intent:

> In discussing the nonjury trial provisions of section 1330(a), the House Report twice refers to the analogy of 28 U.S.C. § 2402, barring jury trials against the United States under the Federal Tort Claims Act.... This suggests a congressional intent to prohibit jury trials in circumstances similar to those in which such trials are prohibited in suits against the United States under the Federal Tort Claims Act.... Parallel trial procedures of the kind employed by the district court in this case are common in Federal Tort Claims Act cases involving nongovernment codefendants....

40 F.3d 1033; *see also Outboard Marine,* 461 F.Supp. at 396; *Mori,* 100 F.R.D. at 812 (citing *Outboard Marine* ). Although *Gould* addressed § 1330(a) not § 1441(d), we have no reason to suspect that Congress envisioned parallel procedures in suits initially filed in the district court but not in suits removed from state court to federal district court. Accordingly, this Court shall employ parallel proceedings in which claims against ATR will be tried to the Court and all other claims tried to a jury. Additionally, pursuant to Rule 39(c), the Court hereby gives notice to the parties that it will employ the same jury for the additional purpose of rendering an advisory opinion with respect to the claims against ATR. As we have noted repeatedly, "[t]his Court has an unassailable faith in the jury trial system," *Noddings Investment Group v. Kelley,* 881 F.Supp. 335, 337 n. 2 (N.D.Ill.1995), and we shall employ the advisory jury procedure in due regard for our strong belief in that system.

## CONCLUSION

It should be obvious from the length of this opinion alone that the issues engendered by plaintiffs' motion to remand are complex and do not admit of any easy answers. This Court has endeavored to not give these issues the short shrift they have received at times. We emphasize that one reason the Court has given these issues the close attention it has—and has asked the parties to use their respective resources to help inform the Court as to these difficult issues—is that the issues are important and need to be properly addressed. A plaintiff's right to trial by jury is sacrosanct in our system of jurisprudence; and, any Act of Congress that limits that right must be subject to the most exacting scrutiny. The Seventh Amendment issues raised in this case presented a very close call and the Court was on the verge of declaring the FSIA unconstitutional under the specific facts presented. However, in the final analysis, the Court was of the opinion that there simply was not enough historical evidence that an action against a corporation owned by a foreign sovereign is an action "of the sort traditionally enforced in an action at law" to overcome the presumption of constitutionality that must be afforded an Act of Congress. *See Association of Westinghouse Salaried Employees v. Westinghouse Elec. Corp.,* 348 U.S. 437, 452–53, 75 S.Ct. 489, 496–97, 99 L.Ed. 510 (1955) (Frankfurter, J.) ("We must ... defer to the strong presumption ... that Congress legislated in accordance with the Constitution.") This principal is especially true in matters of international affairs. In this regard, this Court is also quite mindful of its position as a federal district court and that Congress, as a coequal and representative branch of government, also swears to and is equally bound to uphold the Constitution. Finally, this Court is cognizant that it sits on the shores of Lake Michigan and not on the shores of the Potomac River.

In light of all of these considerations and on the present record, the Court cannot con-

clude that the FSIA infringes the Seventh Amendment right to a jury trial by conferring "foreign state" status on a corporation owned by a foreign government.

Similarly, the issue of whether the word "action" as used in § 1441(d) may reasonably be construed as having different meanings in the first and second sentences of that section also presented a close call; and, here the Court has relied on the canon that a court should strive to interpret a statute in a way that avoids an unconstitutional construction—a canon that is useful in close cases such as the one at bar. *Chapman v. United States*, 500 U.S. 453, 464, 111 S.Ct. 1919, 1927, 114 L.Ed.2d 524 (1991). Although the Court believes that the legislative history of the FSIA supports this construction of the removal provision, we readily acknowledge that reasonable minds may differ as to the reasonableness of this construction.

Several of the other issues presented in this case are as vexatious as the Seventh Amendment issues and raise matters that have split the courts of appeal—with the Seventh Circuit yet to speak. Most notably, in *Alonzi*, 55 F.3d 331 (7th Cir.1995), the Seventh Circuit flagged the issue of the proper scope of removal under § 1441(d) as one that has split the circuits, but the court was unable to resolve the issue for this circuit because it lacked jurisdiction over the case presented. The issue is plainly one about which reasonable minds may differ and it calls for resolution in this circuit. Similarly, with the recent decision of the Ninth Circuit in *Gates*, the courts of appeal are split as to whether the FSIA recognizes "tiering" of ownership interests such that an entity may claim foreign state status notwithstanding the fact that the foreign state's ownership interests are tiered through intermediary corporations. Plainly, as the instant suit reveals, recognizing such tiering has the effect of making the reach of the FSIA extremely expansive, with the result that entities only remotely related to the foreign state may be entitled to claim jury-immunity (if not complete immunity from suit). Although, we believe that we have given effect to the intent of Congress, we flag this issue as one requiring attention from the Court of Appeals, if not Congress.

Today, we find that (1) the FSIA recognizes pooling and tiering of ownership interests; (2) the FSIA's removal provision authorizes removal of the entire suit, not just the claims against the foreign sovereign; (3) the FSIA does not violate the Seventh Amendment by conferring jury-immunity on a corporation owned by a foreign state; and (4) plaintiffs are entitled to jury trials on claims against the nonforeign-state defendants. Accordingly, the Court denies plaintiffs' motion to remand.

In making this ruling, this Court expressly notes that it will seriously consider, if asked, certifying this ruling for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).[22]

Three requirements must be met in order for certification under § 1292(b) to be proper: "(1) the issue certified for appeal must involve a 'controlling question of law'; (2) there must be 'substantial ground for a [sic] difference of opinion' as to the application of this question of law; and (3) the claim must be one in which the immediate appeal of this controlling question of law 'may materially advance the ultimate termination of the litigation....' 28 U.S.C. 1292(b)." *Horwitz v. Alloy Automotive Co.*, 957 F.2d 1431, 1435 (7th Cir.1992).

In view of the foregoing remarks, it should be evident that this Court believes that the issues decided herein are those upon which there is substantial ground for difference of opinion. The issues are also "controlling question[s] of law" because they directly control the fate of these cases in the federal

---

**22.** 28 U.S.C. § 1292(b) provides:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order....

system. Therefore, if, we become convinced that an immediate appeal of this order may materially advance the ultimate termination of this litigation the requirements of 28 U.S.C. § 1292(b) will have been met.